MORRIS ET AL. *v.* GRESSETTE, PRESIDENT PRO TEM, SOUTH CAROLINA SENATE, ET AL.

No. 75–1583.   Argued April 18–19, 1977—Decided June 20, 1977

492

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, REHNQUIST, and STEVENS, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 507. BLACKMUN, J., filed a dissenting opinion, *post*, p. 517.

*J. Roger Wollenberg* argued the cause for appellants. With him on the brief were *Armand Derfner, Max O. Truitt, Jr., Timothy N. Black, William L. Lake, Frank Epstein, Ray P. McClain, Robert A. Murphy,* and *William E. Caldwell.*

*Randall T. Bell* argued the cause for appellees. With him on the brief were *Daniel R. McLeod,* Attorney General of South Carolina, and *Treva G. Ashworth, Kenneth L. Childs,* and *Katherine W. Hill,* Assistant Attorneys General.

*Deputy Assistant Attorney General Turner* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General McCree, Assistant Attorney General Days, Deputy Solicitor General Wallace, Howard E. Shapiro,* and *John C. Hoyle.*

MR. JUSTICE POWELL delivered the opinion of the Court.

The issue in this case concerns the scope of judicial review of the Attorney General's failure to interpose a timely objection under § 5 of the Voting Rights Act of 1965 to a change in the voting laws of a jurisdiction subject to that Act.

I

The events leading up to this litigation date back to November 11, 1971, when South Carolina enacted Act 932 reapportioning the State Senate.[1] South Carolina promptly submitted Act 932 to the Attorney General of the United States for preclearance review pursuant to § 5 of the Voting

---

[1] Act 932 provided for multimember districts, required each candidate to run for a single, numbered post, and specified that primary elections be decided by a majority vote. See *Harper* v. *Levi,* 171 U. S. App. D. C. 321, 325–326, 520 F. 2d 53, 57–58 (1975).

Rights Act. 79 Stat. 439, as amended, 42 U. S. C. § 1973c (1970 ed., Supp. V).[2] That section forbids States subject to the Act to implement any change in "any voting qualification

---

[2] Section 5, as set forth in 42 U. S. C. § 1973c (1970 ed., Supp. V), provides in pertinent part:

"Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b (a) of this title based upon determinations made under the first sentence of section 1973b (b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, . . . such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b (f) (2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of

or prerequisite to voting, or standard, practice, or procedure with respect to voting" without first (i) obtaining a declaratory judgment from the District Court for the District of Columbia that the proposed change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color," or (ii) submitting the change to the Attorney General and receiving no objection within 60 days.[3] While the Attorney General had Act 932 under review, several suits were filed in the United States District Court for the District of South Carolina challenging that Act as violative of the Fourteenth and Fifteenth Amendments and seeking to enjoin its enforcement until preclearance had been obtained under § 5. The cases were consolidated and a three-judge District Court was convened.

On March 6, 1972, the Attorney General interposed an objection to Act 932.[4] Although the South Carolina District Court was aware of this objection—an objection that, standing

three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court."

The constitutionality of this procedure was upheld in *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966). It has been held applicable when a State or political subdivision adopts a legislative reapportionment plan. *Beer* v. *United States,* 425 U. S. 130 (1976); *Georgia* v. *United States,* 411 U. S. 526 (1973); *Allen* v. *State Bd. of Elections,* 393 U. S. 544 (1969).

[3] See *South Carolina* v. *Katzenbach, supra,* at 319–320; *Allen* v. *State Bd. of Elections, supra,* at 548–550; *Hadnott* v. *Amos,* 394 U. S. 358, 366, and n. 5 (1969); *Perkins* v. *Matthews,* 400 U. S. 379, 380–382 (1971); *Georgia* v. *United States, supra,* at 529; *City of Richmond* v. *United States,* 422 U. S. 358, 361–362 (1975); *Beer* v. *United States, supra,* at 131–133; *United Jewish Organizations* v. *Carey,* 430 U. S. 144, 147–148 (1977) (plurality opinion).

[4] The objection was entered within the 60-day statutory period since the submission on Act 932 was not considered to be complete until January 5, 1972. See *Georgia* v. *United States, supra,* at 539–541; n. 19, *infra.* The Attorney General interposed an objection because he had been "unable to conclude . . . that the combination of multi-member districts, numbered posts, and a majority (run-off) requirement would not occasion an abridgement of minority voting rights in South Carolina." App. 27.

alone, would have justified an injunction against enforcement of the Act—the court proceeded to address the constitutional validity of the reapportionment plan.[5] That court rejected the Fifteenth Amendment claim for lack of evidence that Act 932 was racially motivated, but held that the Act violated the Fourteenth Amendment due to malapportionment. The court retained jurisdiction and allowed South Carolina 30 days to enact an acceptable substitute reapportionment plan. *Twiggs* v. *West,* Civ. No. 71–1106 (SC, Apr. 7, 1972).

On May 6, 1972, a new senate reapportionment plan was enacted into law as § 2 of Act 1205.[6] This new plan was filed with the District Court, and it was submitted to the Attorney General on May 12 for preclearance review. On May 23 the District Court found the plan constitutional.[7] By letter dated

---

[5] The District Court declined to rule on the claims under § 5 of the Voting Rights Act:

"Prior to final arguments, the Attorney General of the United States had refused to approve the Act under the terms of the Voting Rights Act of 1965. The defendants stated, during argument, that they intended to contest that decision of the Attorney General in the District Court of the District of Columbia, which, by law, is the proper forum for review under the terms of the Voting Rights Act of 1965. We shall accordingly not consider the claims of the plaintiff McCollum, under the Voting Rights Act, but shall confine our consideration to the claims of invalidity under the Fourteenth and Fifteenth Amendments, which admittedly are properly before this Court." App. to Jurisdictional Statement 30a.

[6] Section 2 reapportioned the State's senatorial districts. It established two alternative reapportionments—Plan A and Plan B—and provided that if Plan A did not meet the constitutional guidelines as set forth by the District Court, Plan B would be put into effect. Act 1205 retained the provisions of Act 932 calling for multimember districts, numbered posts, and a majority vote in primaries. See *Harper* v. *Levi,* 171 U. S. App. D. C., at 326, 520 F. 2d, at 58.

Section 3 of Act 1205 extended the numbered-post requirement to existing multimember districts in the State's House of Representatives, the other chamber of the South Carolina General Assembly.

[7] This Court summarily affirmed the decision of the District Court. *Powell* v. *West,* 413 U. S. 901 (1973).

June 30, the Attorney General notified South Carolina that he would not interpose an objection to the new plan because he felt "constrained to defer to the . . . determination of the three-judge District Court" in *Twiggs* v. *West, supra.*[8] App. 48. Thus, as of June 30, 1972, § 2 of Act 1205 had been declared constitutional by a three-judge District Court, and the Attorney General had declined to interpose an objection under § 5 of the Voting Rights Act.[9]

Not content with the Attorney General's decision to defer to the judicial determination of the three-judge District Court, several of the named plaintiffs in the consolidated *Twiggs* action commenced another suit in the United States District Court for the District of Columbia on August 10, 1972, in which they challenged the Attorney General's failure to object to the new senate reapportionment plan. On May 16, 1973, that court ordered the Attorney General to make "a reasoned decision in accordance with his statutory responsibility." *Harper* v. *Kleindienst,* 362 F. Supp. 742, 746 (1973). In

---

[8] This Court held in *Connor* v. *Waller,* 421 U. S. 656 (1975), that reapportionment legislation adopted by the legislature on its own authority in the course of litigation is not effective in a covered jurisdiction until after compliance with § 5's preclearance review provisions. (Such legislation is to be distinguished from a "reapportionment scheme . . . submitted and adopted pursuant to court order," for which preclearance is not required. *East Carroll Parish School Bd.* v. *Marshall,* 424 U. S. 636, 638 n. 6 (1976).) In light of the decision in *Waller,* the Attorney General has now abandoned his earlier policy of deference to district court decisions on constitutionality. Brief for United States as *Amicus Curiae* 10, 16.

[9] While the Attorney General was considering Act 1205, South Carolina submitted for preclearance review Act 1204, which extended the numbered-post requirement to "all multi-member elective districts" in the State. See *Harper* v. *Levi, supra,* at 326, 520 F. 2d, at 58. On the same day that he declined to interpose an objection to § 2 of Act 1205, the Attorney General did interpose an objection to Act 1204 and to that portion of Act 1205 that required numbered posts for the State's House of Representatives. See n. 6, *supra.* The District Court in *Twiggs* v. *West* had not considered any provisions relating to the House.

response to this order, the Attorney General stated that in his view the plan violated the Fifteenth Amendment, but he reaffirmed his refusal to interpose an objection on the ground that he was constrained to defer to the ruling of the District Court in *Twiggs* v. *West*. App. to Brief for Appellants 4a. On July 19, 1973, the District of Columbia District Court directed the Attorney General to consider Act 1205 without regard to the decision in *Twiggs* v. *West*. The next day the Attorney General interposed an objection because he was "unable to conclude that Act No. 1205 does not have the effect of abridging voting rights on account of race." App. 52.

On appeal, the United States Court of Appeals for the District of Columbia Circuit affirmed. It held that the Attorney General's decision not to interpose an objection was reviewable under the circumstances of this case,[10] and that § 5 requires him to make an independent determination on the merits of § 5 issues. *Harper* v. *Levi*, 171 U. S. App. D. C. 321, 520 F. 2d 53 (1975).

Armed with the decision of the Court of Appeals and the belated objection interposed by the Attorney General, two South Carolina voters filed the present suit in the United States District Court for the District of South Carolina as a class action under § 5 of the Voting Rights Act. See *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 557–563 (1969). The plaintiffs, appellants here, sought an injunction against implementation of § 2 of Act 1205 on the ground that the Attorney General had interposed an objection and the State had not

---

[10] The Court of Appeals stressed that the *Harper* plaintiffs contended only that "the Attorney General improperly relinquished his responsibility to independently evaluate the submitted legislation . . . ." Since they were "not challenging findings by the Attorney General on issues of fact, or an ultimate decision as to whether the submitting authority has discharged its burden of proving lack of discriminatory purpose or effect," the court found it unnecessary to decide whether such findings and decisions would be reviewable. 171 U. S. App. D. C., at 335, 520 F. 2d, at 67. See also n. 24, *infra*.

subsequently obtained a favorable declaratory judgment from the United States District Court for the District of Columbia. The three-judge District Court convened under § 5 dismissed the complaint. 425 F. Supp. 331 (1976). It held that the doctrine of collateral estoppel did not preclude it from considering South Carolina's contention that, notwithstanding the decision in *Harper* v. *Levi, supra,* the requirements of § 5 were satisfied when the Attorney General failed to interpose an objection within 60 days after submission to him of Act 1205.[11] The District Court also ruled that the Administrative Procedure Act did not authorize judicial review of the Attorney General's initial determination to defer to the ruling of the three-judge District Court in *Twiggs* v. *West*. In light of these considerations, the District Court concluded that the failure of the Attorney General to interpose an objection within the applicable 60-day period left South Carolina free to implement the new senate reapportionment plan.

We noted probable jurisdiction to determine the reviewability of the Attorney General's failure to interpose a timely objection under § 5 of the Voting Rights Act. 429 U. S. 997 (1976). For the reasons stated below, we affirm.

## II

The ultimate issue in this case concerns the implementation of South Carolina's reapportionment plan for the State Senate. Since that plan has not been declared by the District Court for the District of Columbia to be without racially discriminatory purpose or effect, it can be implemented only if the Attorney General "has not interposed an objection" to the plan within the meaning of § 5 of the Voting Rights Act.[12] It

---

[11] Appellants have not pressed the collateral-estoppel argument in this Court. See Brief for Appellants 17–20.

[12] Although appellants at one point argued in the District Court that Act 1205 was a court-ordered plan outside the scope of § 5, see *East Carroll Parish School Bd.* v. *Marshall, supra;* n. 8, *supra,* the parties now

is conceded that no objection was entered within the 60-day period. 425 F. Supp., at 333. But appellants insist that the Attorney General's *nunc pro tunc* objection of July 20, 1973, is effective under the Act and thus bars implementation of the reapportionment plan. Since that objection was interposed pursuant to the District Court's order in *Harper* v. *Kleindienst,* its validity depends on whether the *Harper* court had jurisdiction under the Administrative Procedure Act to review the Attorney General's failure to object.[13]

The Administrative Procedure Act stipulates that the provisions of that Act authorizing judicial review apply "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."

---

agree that § 5 is applicable. Brief for Appellants 3 n. 1; Brief for Appellees 14, and n. 7. See also Brief for United States as *Amicus Curiae* 14 n. 8.

[13] Appellants suggest that it is unnecessary for this Court to reach the issue of reviewability since the single-judge District Court in *Harper* v. *Kleindienst,* 362 F. Supp. 742 (DC 1973), issued an interlocutory order on August 11, 1972, declaring that the Attorney General's time to object had not expired and extending the time until the Attorney General acted or until further order of the District Court. Relying on *United States* v. *Mine Workers,* 330 U. S. 258, 289–295 (1947), appellants contend that the Attorney General's objection of July 20, 1973, is valid regardless of the District Court's jurisdiction since it was entered pursuant to that court's order preserving the status quo pending its determination of jurisdiction.

The *Mine Workers* case involved the power of a district court to hold a party in contempt for disobedience of an order directed to that party. Appellants' reliance on that case is misplaced, for South Carolina was not a party to the *Harper* litigation and was not under a court order restraining enforcement of § 2 of Act 1205. Here the validity of the District Court's interlocutory order in *Harper* v. *Kleindienst* eventually turns on the reviewability of the Attorney General's initial decision not to enter an objection to § 2 of Act 1205. If Congress has precluded judicial review of the Attorney General's actions under § 5, the *Harper* court's interlocutory order cannot validate the Attorney General's *nunc pro tunc* objection of July 20, 1973.

5 U. S. C. § 701 (a).[14]   It is now well settled that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 140 (1967).[15]   The reviewing court must determine whether "Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion." *Barlow* v. *Collins,* 397 U. S. 159, 165 (1970).

As no provision of the Voting Rights Act expressly precludes judicial review of the Attorney General's actions under § 5, it is necessary to determine "whether nonreviewability can fairly be inferred." 397 U. S., at 166. See *Association of Data Processing Service Orgs.* v. *Camp,* 397 U. S. 150, 157 (1970); *Switchmen* v. *National Mediation Board,* 320 U. S. 297 (1943). That inquiry must address the role played by the Attorney General within "the context of the entire legislative scheme." *Abbott Laboratories* v. *Gardner, supra,* at 141.

The nature of the § 5 remedy, which this Court has characterized as an "unusual" and "severe" procedure, *Allen* v. *State Bd. of Elections,* 393 U. S. 544, 556 (1969), strongly suggests that Congress did not intend the Attorney General's actions under that provision to be subject to judicial review. Section 5 requires covered jurisdictions to delay implementation of validly enacted state legislation until federal authorities have had an opportunity to determine whether that

---

[14] With several exceptions not relevant here, the Act defines an agency as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency . . . ." 5 U. S. C. § 701 (b) (1).

[15] Accord, *Dunlop* v. *Bachowski,* 421 U. S. 560, 567 (1975); *Citizens to Preserve Overton Park* v. *Volpe,* 401 U. S. 402, 410 (1971); *Tooahnippah* v. *Hickel,* 397 U. S. 598, 606 (1970); *Association of Data Processing Service Orgs.* v. *Camp,* 397 U. S. 150, 156–157 (1970); *Barlow* v. *Collins,* 397 U. S. 159, 166 (1970).

legislation conforms to the Constitution and to the provisions of the Voting Rights Act. See *South Carolina* v. *Katzenbach*, 383 U. S. 301, 334 (1966). Section 5 establishes two alternative methods by which covered jurisdictions can comply with this severe requirement of federal preclearance review. First, a covered jurisdiction may file a declaratory judgment action in the District Court for the District of Columbia and subsequently may implement the change in voting laws if that court declares that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U. S. C. § 1973c (1970 ed., Supp. V). Second, a covered jurisdiction may submit a change in voting laws to the Attorney General and subsequently may enforce the change if "the Attorney General has not interposed an objection within sixty days after such submission." *Ibid.*

According to the terms of § 5, a covered jurisdiction is in compliance pursuant to the latter alternative once it has (i) filed a complete submission with the Attorney General, and (ii) received no objection from that office within 60 days. This second method of compliance under § 5 is unlike the first in that implementation of changes in voting laws is not conditioned on an affirmative statement by the Attorney General that the change is without discriminatory purpose or effect.[16] To the contrary, compliance with § 5 is measured solely by the *absence,* for whatever reason, of a timely objection on the part of the Attorney General.[17] And this Court

---

[16] Nor has this Court read § 5 to condition the interposition of an objection by the Attorney General on an affirmative finding that he has reason to believe that the change in voting laws has the prohibited purpose or effect. Compare *Georgia* v. *United States*, 411 U. S., at 540–541, with *id.*, at 544–545 (WHITE, J., dissenting), and *id.*, at 545 (POWELL, J., dissenting).

[17] Our prior cases have so described the statutory scheme. See, *e. g., City of Richmond* v. *United States*, 422 U. S., at 362 (change in

has recognized that "[o]nce the State has successfully complied with the § 5 approval requirements, private parties may enjoin the enforcement of the new enactment only in traditional suits attacking its constitutionality; there is no further remedy provided by § 5." *Allen* v. *State Bd. of Elections, supra,* at 549–550.

Although there is no legislative history bearing directly on the issue of reviewability of the Attorney General's actions under § 5, the legislative materials do indicate a desire to provide a speedy alternative method of compliance to covered States. Section 8 of the original bill provided for preclearance review only by means of a declaratory judgment action in the District Court for the District of Columbia. Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess. (1965) (hereafter Senate Hearings). Justified concerns arose that the time required to pursue such litigation would unduly delay the implementation of validly enacted, nondiscriminatory state legislation. Cognizant of the problem, Attorney General Katzenbach suggested that the declaratory judgment procedure "could be improved by applying it only to those laws which the Attorney General takes exception to within a given period of time." Senate Hearings 237. The legislation was changed to incorporate this suggestion.[18]

---

voting laws cannot be implemented unless "such change has either been approved by the Attorney General or that officer has failed to act within 60 days after submission to him"); *Georgia* v. *United States, supra,* at 529 (change in voting laws can be implemented upon "submitting the plan to the Attorney General of the United States and receiving no objection within 60 days").

[18] Compliance by means of submission to the Attorney General was added to the bill, but neither the Committee Reports nor the debates discussed the addition. S. Rep. No. 162, 89th Cong., 1st Sess. (1965); H. R. Conf. Rep. No. 711, 89th Cong., 1st Sess. (1965). The legislative history is summarized in *Harper* v. *Levi,* 171 U. S. App. D. C., at 333, 520 F. 2d, at 65.

In light of the potential severity of the § 5 remedy, the statutory language, and the legislative history, we think it clear that Congress intended to provide covered jurisdictions with an expeditious alternative to declaratory judgment actions. The congressional intent is plain: The extraordinary remedy of postponing the implementation of validly enacted state legislation was to come to an end when the Attorney General failed to interpose a timely objection based on a complete submission.[19] Although there was to be no bar to subsequent constitutional challenges to the implemented legislation, there also was to be "no dragging out" of the extraordinary federal remedy beyond the period specified in the statute. *Switchmen* v. *National Mediation Board,* 320 U. S., at 305. Since judicial review of the Attorney General's

---

[19] The Attorney General has promulgated regulations providing that the 60-day period shall commence from the time that the Department of Justice receives a submission satisfying certain enumerated requirements. 28 CFR § 51.3 (b)–(d) (1976). These regulations were reviewed and found valid by this Court in *Georgia* v. *United States, supra.* The Court noted that "[t]he judgment that the Attorney General must make is a difficult and complex one, and no one would argue that it should be made without adequate information." 411 U. S., at 540. To deny the Attorney General the power to suspend the 60-day period until a complete submission was tendered would leave him no choice but to interpose an objection to incomplete submissions, a result which "would only add acrimony to the administration of § 5." *Id.,* at 541.

Nothing in our opinion in *Georgia* v. *United States* suggests that Congress did not intend to preclude judicial review of the Attorney General's failure to interpose an objection within 60 days of a complete submission. The factors relied on in that case are inapplicable once a complete submission has been pending before the Attorney General for 60 days. Indeed, subsequent judicial review of the Attorney General's failure to interpose a timely objection to a complete submission would itself "add acrimony" by denying covered jurisdictions the statutorily prescribed "rapid method of rendering a new state election law enforceable." *Allen* v. *State Bd. of Elections,* 393 U. S., at 549; see *Georgia* v. *United States, supra,* at 538.

actions would unavoidably extend this period, it is necessarily precluded.[20]

Our conclusions in this respect are reinforced by the fact that the Attorney General's failure to object is not conclusive with respect to the constitutionality of the submitted state legislation.[21] The statute expressly provides that neither "an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object . . . shall bar a subsequent action to enjoin enforcement" of the newly enacted legislation or voting regulation. Cf. *Dunlop* v. *Bachowski,* 421 U. S. 560, 569–570 (1975). It is true that it was the perceived inadequacy of private suits under the Fifteenth Amendment that prompted Congress to pass the Voting Rights Act. *Allen* v. *State Bd. of Elections,* 393 U. S., at 556 n. 21; *South Carolina* v. *Katzenbach,*

---

[20] MR. JUSTICE MARSHALL's dissent voices concern over a perceived "unique[ness]" of today's decision. *Post,* at 514, and n. 10. But the decision is unique only in the sense that every judicial holding with respect to implied preclusion of judicial review is unique; "the context of the entire legislative scheme," *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 141 (1967), differs from statute to statute. *Dunlop* v. *Bachowski,* 421 U. S. 560 (1975), the case cited by the dissent, illustrates the point. In that case, the Court did not confront anything analogous to the potential severity of the § 5 remedy at issue here. See *supra,* at 504. Moreover, the statute at issue in *Dunlop* provided that suit by the Secretary of Labor would be the *exclusive* post-election remedy. In the instant case, on the other hand, objection by the Attorney General is not the exclusive method of challenging changes in a State's voting laws, since the Attorney General's failure to object is not conclusive with respect to the constitutionality of submitted state legislation. See *infra,* this page.

[21] Similarly, an objection on the part of the Attorney General is not conclusive with respect to the invalidity of the submitted state legislation under the Constitution or the Voting Rights Act. After receiving an objection from the Attorney General, a covered jurisdiction retains the option of seeking a favorable declaratory judgment from the District Court for the District of Columbia. See *Beer* v. *United States, supra; City of Petersburg* v. *United States,* 410 U. S. 962 (1973), summarily aff'g 354 F. Supp. 1021 (DC 1972).

383 U. S., at 309. But it does not follow that Congress did not intend to preclude judicial review of Attorney General actions under § 5.[22] The initial alternative requirement of submission to the Attorney General substantially reduces the likelihood that a discriminatory enactment will escape detection by federal authorities.[23] Where the discriminatory char-

---

[22] Relying on the fact that § 4 of the Voting Rights Act expressly precludes judicial review of the Attorney General's actions under that section, *post,* at 509–510, and n. 3, see *Briscoe* v. *Bell, ante,* p. 404, MR. JUSTICE MARSHALL's dissent would formulate a new mechanical rule of statutory construction: If one section of a statute expressly forbids judicial review, it would not be open for the courts to inquire whether Congress also intended to preclude review under other sections of the same statute. Application of such a rule of statutory construction would prevent a court from giving effect to congressional intent that otherwise was clear from "the context of the entire legislative scheme." *Abbott Laboratories* v. *Gardner, supra,* at 141. The existence of an express preclusion of judicial review in one section of a statute is a factor relevant to congressional intent, but it is not conclusive with respect to reviewability under other sections of the statute. Here, we simply conclude that other factors—the harsh nature of the § 5 remedy, the statutory language, and the legislative materials—are sufficiently strong indications of congressional intent to override any contrary inference that might be drawn from the fact that Congress expressly precluded judicial review in a different section of the same statute.

[23] MR. JUSTICE MARSHALL's dissent opens with a "floodgates" argument: If there is no judicial review when the Attorney General misunderstands his legal duty, there also will be no judicial review when at sometime in the future the Attorney General bargains acquiescence in a discriminatory change in a covered State's voting laws in return for that State's electoral votes. *Post,* at 508, and n. 1. That "floodgates" concern is equally applicable to Congress' express preclusion of judicial review under § 4 of the Act, see n. 22, *supra,* a fact which suggests that Congress—like the courts—operates on the assumption that the Attorney General of the United States will perform faithfully his statutory responsibilities. In determining whether preclusion of judicial review can fairly be inferred from the context of the entire legislative scheme, we place no weight on the prospect that an Attorney General someday will trade electoral votes for preclearance under § 5.

acter of an enactment is not detected upon review by the Attorney General, it can be challenged in traditional constitutional litigation. But it cannot be questioned in a suit seeking judicial review of the Attorney General's exercise of discretion under § 5, or his failure to object within the statutory period.[24]

### III

For these reasons, we hold that the objection interposed by the Attorney General to § 2 of Act 1205 on July 20, 1973, *nunc pro tunc,* is invalid.[25] South Carolina is therefore free to implement its reapportionment plan for the State Senate.

*Affirmed.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

The Court holds today that an Attorney General's failure to object within 60 days to the implementation of a voting law that has been submitted to him under § 5 of the Voting

---

[24] The United States suggests that there should be limited judicial reveiw only when the Attorney General improperly relinquishes his responsibility to evaluate independently the submitted legislation in light of the standards established by § 5. Brief for United States as *Amicus Curiae* 30–31. For the reasons stated in text, we think Congress intended to preclude all judicial review of the Attorney General's exercise of discretion or failure to act. We note, however, that there is no evidence in this case that the Attorney General improperly "relinquished" his statutory responsibilities. The record is clear that the Attorney General reviewed the submitted legislation as well as the judicial determination in *Twiggs* v. *West* and *decided* not to interpose an objection to § 2 of Act 1205. That decision may have been erroneous, see n. 8, *supra,* but it nonetheless was a decision exercised pursuant to the Attorney General's § 5 responsibilities.

[25] In light of this disposition of the case, we find it unnecessary to address the argument advanced by South Carolina that the single judge in *Harper* v. *Kleindienst,* 362 F. Supp. 742 (DC 1973), had no jurisdiction to determine questions arising under § 5 of the Voting Rights Act. See *Allen* v. *State Bd. of Elections,* 393 U. S., at 560–563.

Rights Act, as amended, 42 U. S. C. § 1973c (1970 ed., Supp. V), cannot be questioned in any court. Under the Court's ruling, it matters not whether the Attorney General fails to object because he misunderstands his legal duty, as in this case; because he loses the submission; or because he seeks to subvert the Voting Rights Act. Indeed, the Court today grants unreviewable discretion to a future Attorney General to bargain acquiescence in a discriminatory change in a covered State's voting laws in return for that State's electoral votes.[1] Cf. J. Randall & D. Donald, The Civil War and Reconstruction 678–701 (2d ed. 1961) (settlement of the election of 1876).

Common sense proclaims the error of this result. It is simply implausible that Congress, which devoted unusual attention to this Act in recognition of its stringency and importance, see *South Carolina* v. *Katzenbach,* 383 U. S. 301, 308–309 (1966), intended to allow the Act's primary enforce-

---

[1] "QUESTION: . . . I thought it was your position that even if he [the Attorney General] had said, we're interposing no objection because South Carolina voted Republican at the last election, that even that wouldn't be reviewable.

"[Counsel]: We think—

"QUESTION: Isn't that your position in its ultimate effect?

"[Counsel]: If that were his objection, we would be quite confident in coming to the District Court of the District of Columbia ourselves, if he had objected on that basis.

"QUESTION: No, I said, he didn't object; he says, we're interposing no objection because your state voted right at the last election. Now what if he did that? Would that be reviewable? In your submission, it would not be; isn't that correct?

"[Counsel]: It would not—it would not fall within the kind of review being sought here.

"QUESTION: Exactly.

"[Counsel]: I don't think we want to go so far as to say that what the Attorney General—

"QUESTION: Well, your argument does go, and necessarily goes that far, as I understand it; and I don't find that shocking." Tr. of Oral Arg. 52–53.

ment mechanism to be vitiated at the whim of an Attorney General. Legal analysis supports the conclusion that Congress did no such thing. But today, the majority puts aside both common sense and legal analysis, relying instead on fiat. I dissent.

## I

## A

I agree with the majority that the dispositive issue in this case is whether Congress has precluded all judicial review of the Attorney General's failure to enter an objection to implementation of a state statute submitted to him for review under § 5.[2] And, as the majority notes, it is indeed "well settled that 'judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.' " *Ante,* at 501, quoting *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 140 (1967). If the Court applied rather than merely acknowledged this standard, the judgment below would be reversed.

The Voting Rights Act does not explicitly preclude review of the Attorney General's actions under § 5. The absence

---

[2] The court below, in addition to finding that Congress had barred review, held that the Attorney General's actions under § 5 are not reviewable because they are not "adjudicatory" and because objecting voters have an adequate remedy in their right to challenge the constitutionality of state laws to which the Attorney General has failed to object. The court also concluded that the possibility of bringing a constitutional action prevents voters from attaining the status of persons "adversely affected or aggrieved," 5 U. S. C. § 702, by the Attorney General's failure to object. 425 F. Supp. 331, 337–339.

I take the majority to have rejected these holdings, since the Court would not need to consider whether Congress had precluded review if it agreed with the District Court that appellants did not have standing or that the failure to object is not a reviewable agency action under the Administrative Procedure Act, 5 U. S. C. § 704. Since the majority rejects these holdings, I merely note that in my view, these alternative holdings of the District Court are patently erroneous.

of such a provision places on appellees "the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of [the Attorney General's] decision[s]." *Dunlop* v. *Bachowski,* 421 U. S. 560, 567 (1975). The normal "strong" presumption is strengthened still further in this case by the express prohibition, contained in § 4 (b) of the Act, 42 U. S. C. § 1973b (b), of judicial review of the Attorney General's determinations under that section as to which States are covered by the Act.[3] If the Congress that wrote § 4 had also intended to preclude review of the same officer's actions under § 5, it would certainly have said so. The Court makes no effort to explain why the congressional silence in § 5 should be treated as the equivalent of the congressional statement in § 4.

Not only is there nothing in § 5 precluding review, there is also, as the Court admits, "no legislative history bearing directly on the issue of reviewability of the Attorney General's actions under § 5." *Ante,* at 503. Thus, all the Court offers in support of its conclusion that the strengthened presumption of reviewability should be disregarded in this case is an inference that review must be foreclosed to serve the assertedly primary congressional purpose of limiting the time during which covered States are prevented from implementing new legislation. That inference is purportedly drawn from an inquiry into "the role played by the Attorney General within 'the context of the entire legislative scheme.'" *Ante,* at 501, quoting *Abbott Laboratories* v. *Gardner, supra,* at 141. In fact, however, the Court completely ignores the Attorney General; the majority's version of § 5 requires a covered State to submit its statutes to a mailing address at the Department of Justice and to wait for 60 days before implementing

---

[3] This explicit statutory preclusion was decisive in *Briscoe* v. *Bell, ante,* p. 404. The conclusion in that case that review is precluded when Congress says so obviously does not support the conclusion that review is also precluded when Congress has not said so.

the submitted laws, but it does not impose any duties on the Attorney General. The time limit on the Attorney General's action, and not any requirement that he review submitted laws for compliance with the Voting Rights Act is, according to the Court, the key aspect of the part of § 5 with which we are concerned.

We have previously taken a much different view of § 5. Just four years ago, in *Georgia* v. *United States,* 411 U. S. 526 (1973), we were required to consider the Attorney General's role in § 5. We recognized that in doing so,

"it is important to focus on the entire scheme of § 5. That portion of the Voting Rights Act essentially freezes the election laws of the covered States unless a declaratory judgment is obtained in the District Court for the District of Columbia holding that a proposed change is without discriminatory purpose or effect. The alternative procedure of submission to the Attorney General '*merely* gives the covered State a rapid method of rendering a new state election law enforceable.' *Allen* v. *State Board of Elections,* 393 U. S. [544,] 549." 411 U. S., at 538 (emphasis added).

Because the provision for submission to the Attorney General was meant only to ameliorate and not to change the "essential" burden of § 5, we upheld regulations that deferred the beginning of the 60-day review period created by the Act until a submission satisfied certain criteria. We noted that "[t]he judgment that the Attorney General *must* make is a difficult and complex one," 411 U. S., at 540 (emphasis added), and that if he could not await complete information, "his only plausible response to an inadequate or incomplete submission would be simply to object to it." [4] *Ibid.* We also upheld

---

[4] Under today's holding, of course, the Attorney General is now granted license to make the entirely "implausible" response of failing to enter an objection no matter how incomplete or inadequate the State's submission may be.

the Attorney General's placement of the burden of proof on States submitting legislation for approval, because

> "[a]ny less stringent standard might well have rendered the formal declaratory judgment procedure a dead letter by making available to covered States a far smoother path to clearance." *Id.*, at 538.

In contrast to today's ruling, we held that providing such a path was not the function of the proviso to § 5 which established clearance by the Attorney General as an alternative to the declaratory judgment action.

Our description in *Georgia* v. *United States* of the very limited function of the proviso supports the conclusion that the Attorney General should respond to a submitted statute as would the District Court for the District of Columbia if the State brought a declaratory judgment action seeking approval of that statute. The regulation approved by the Court in *Georgia* v. *United States* explicitly imposes that obligation on the Attorney General. 28 CFR § 51.19 (1976).[5] Moreover, the regulation also specifies the actions the Attorney General must take:

> "If the Attorney General is satisfied that the submitted change does not have a racially discriminatory purpose or effect, he will not object to the change and will so notify the submitting authority. If the Attorney General

---

[5] Curiously, the Court never mentions this regulation. The portion of the regulation not quoted in text reads as follows:

"Section 5, in providing for submission to the Attorney General as an alternative to seeking a declaratory judgment from the U. S. District Court for the District of Columbia, imposes on the Attorney General what is essentially a judicial function. Therefore, the burden of proof on the submitting authority is the same in submitting changes to the Attorney General as it would be in submitting changes to the District Court for the District of Columbia. The Attorney General shall base his decision on a review of material presented by the submitting authority, relevant information provided by individuals or groups, and the results of any investigation conducted by the Department of Justice."

determines that the submitted change has a racially discriminatory purpose or effect, he will enter an objection and will so notify the submitting authority. If the evidence as to the purpose or effect of the change is conflicting, and the Attorney General is unable to resolve the conflict within the 60-day period, he shall, consistent with the above-described burden of proof [on the State] applicable in the District Court, enter an objection and so notify the submitting authority." *Ibid.*

This validly adopted regulation, which clearly requires the Attorney General to enter an objection *unless* he determines the submitted legislation has neither the proscribed purpose nor the forbidden effect, is binding on the Attorney General. See *United States* v. *Nixon,* 418 U. S. 683, 695–696 (1974); *Vitarelli* v. *Seaton,* 359 U. S. 535 (1959); *Service* v. *Dulles,* 354 U. S. 363 (1957); *United States ex rel. Accardi* v. *Shaughnessy,* 347 U. S. 260 (1954).

Thus, both the statute and the regulation impose on the Attorney General a duty to review submitted statutes and disapprove them unless he is satisfied that they meet the standards established by the Act. It is undisputed in this case that the Attorney General, after reviewing the reapportionment legislation submitted by South Carolina, was unable to make that determination.[6] It was, therefore, his duty to

---

[6] As the majority notes, the Attorney General objected to Act 932 because of the combination of multimember districts, numbered posts, and a majority-runoff requirement. *Ante,* at 495, and n. 4. The same objectionable features are contained in the senate reapportionment plan of Act 1205. The Attorney General did not object to that plan solely because he felt "constrained to defer" to the holding in *Twiggs* v. *West,* Civ. No. 71–1106 (SC, Apr. 7, 1972), that the aspects of the reapportionment plan to which he had objected did not establish a violation of the Fifteenth Amendment because they were not racially motivated. *Ante,* at 496–497. That the Attorney General nevertheless maintained his belief that these features are inconsistent with the Voting Rights Act is shown by his simultaneous action in objecting to their extension to all other multimember

object to implementation of that legislation. He did not perform that duty,[7] deferring instead to a District Court judgment that the majority concedes should not have been entered.[8]

The majority holds that this failure is insulated from judicial review under the provision of the Administrative Procedure Act expressly designed for such defaults, 5 U. S. C. § 706 (1),[9] for one reason only: The statute contains a deadline within which the Attorney General must act. This holding that the existence of a deadline for the performance of an administrative duty is a "persuasive reason" to believe that failure to perform that duty cannot be reviewed is unique among our decisions.[10] I trust it will remain unique. Nothing

---

districts in the State. App. 47. The Attorney General felt himself free to enter that objection because the *Twiggs* court had approved only the legislation relating to the Senate. See also App. to Brief for Appellants 4a (memorandum submitted by Attorney General to court in *Harper* v. *Kleindienst,* 362 F. Supp. 742 (DC 1973), reiterating that Act 1205 would be objectionable but for the holding in *Twiggs* v. *West, supra*); App. 51 (letter from Assistant Attorney General indicating that on behalf of the Attorney General he would have objected to Act 1205 but for the decision in *Twiggs*).

[7] The majority halfheartedly argues that the Attorney General did not relinquish his responsibility because it is clear that he reviewed Act 1205 and decided not to enter an objection to its implementation. *Ante,* at 507 n. 24. But it is clear, see n. 6, *supra,* that the only decision made by the Attorney General was the decision to defer to the views of the District Court in *Twiggs* v. *West, supra.* The Attorney General did not perform the duty imposed on him by the statute and his own regulations, which was to evaluate Act 1205 and enter an objection to it unless he was satisfied that it met the criteria of the Voting Rights Act.

[8] See *ante,* at 495–496. See also *United States* v. *Board of Supervisors,* 429 U. S. 642 (1977); *Connor* v. *Waller,* 421 U. S. 656 (1975).

[9] "The reviewing court shall—
"(1) compel agency action unlawfully withheld or unreasonably delayed."

[10] In *Dunlop* v. *Bachowski,* 421 U. S. 560 (1975), we held reviewable the Secretary of Labor's decision not to challenge the validity of a union

in the existence of a deadline for the performance of an administrative duty provides persuasive reason—or indeed any reason at all—to believe that failure to perform that duty cannot be reviewed.[11] The illogic of the Court's argument transmogrifies a deadline for action into an impenetrable shield for inaction.

## B

The Court's conclusion is not only inconsistent with our description of § 5 in *Georgia* v. *United States,* it is also flatly inconsistent with our holding in that case. For in *Georgia* v. *United States,* we reviewed the standard by which the Attorney General determined to object to implementation of a submitted statute. The majority approved of the standard, and the dissenters objected to it,[12] but the Court unanimously

---

election under 29 U. S. C. § 482. Section 482, like § 5 of the Voting Rights Act, contains a 60-day deadline.

[11] The majority's argument appears to be that review would defeat the congressional purpose of providing a speedier way than the declaratory judgment action for States to gain permission to implement new voting laws. Of course, this concern would only be relevant if it were necessarily true that the State could not implement the new law between the expiration of the 60-day period and the final judicial determination requiring the Attorney General to re-examine the statute. As this case illustrates, allowing review is not the same as requiring suspension of the challenged law until the review of the Attorney General's action has been completed.

[12] My BROTHER WHITE protested:

"Surely, objections by the Attorney General would not be valid if that officer considered himself too busy to give attention to § 5 submissions and simply decided to object to all of them, to one out of 10 of them or to those filed by States with governors of a different political persuasion. Neither, I think, did Congress anticipate that the Attorney General could discharge his statutory duty by simply stating that he had not been persuaded that a proposed change in election procedures would not have the forbidden discriminatory effect. It is far more realistic and reasonable to assume that Congress expected the Attorney General to give his careful and good-faith consideration to § 5 submissions and, within 60 days after receiving all information he deemed necessary, *to make up his mind as to*

rejected the Government's argument that the propriety of the objection was "outside the permissible scope of judicial inquiry." Brief for United States in *Georgia* v. *United States,* O. T. 1972, No. 72–75, p. 38.

The Court simply ignores this glaring contradiction between our action in *Georgia* v. *United States* and its holding today. Since the Court does not overrule *Georgia* v. *United States,* I can only conclude that the law now allows review of the Attorney General's decision to object to implementation of a statute, but it does not allow review of his failure to object.[13] I can find no support for such a bizarre rule. I am sure that others, especially members of the Congress whose intent the Court is supposedly following, will be equally baffled.

## II

Perhaps out of justifiable embarrassment, the majority never mentions the effect of its ruling. That effect is easy to describe: The Court today upholds a system of choosing members of the South Carolina Senate that has prevented the election of any black senators, despite the fact that 25% of South Carolina's population is black.[14] Thus, South Caro-

_whether the proposed change did or did not have a discriminatory purpose or effect, and if it did, to object thereto."_ 411 U. S., at 543 (emphasis added).

Under the majority's holding today, of course, failure to object for any of the reasons my Brother considered clearly invalid would not be subject to judicial correction.

[13] But cf. *ante,* at 505 n. 21 and 507 n. 24.

[14] The majority argues that preclusion of review is consistent with the congressional purpose because even if one or two bad laws slip by the Attorney General, the requirement that the laws be submitted to him will result in the interception of most discriminatory legislation. *Ante,* at 506–507. The effect of today's ruling, which allows South Carolina to keep its senate closed to blacks, demonstrates the fatuousness of this quantitative argument. Moreover, the Voting Rights Act, as restructured by the Court, now imposes no enforceable restraint on an Attorney General's decision not to object to any discriminatory laws.

lina, which was a leader of the movement to deprive the former slaves of their federally guaranteed right to vote, *South Carolina* v. *Katzenbach,* 383 U. S., at 310–311, and n. 9, 333–334, is allowed to remain as one of the last successful members of that movement. It would take much more evidence than the Court can muster to convince me that this result is consistent with "Congress' firm intention to rid the country of racial discrimination in voting." *Id.,* at 315. Certainly the Court has failed to identify " 'clear and convincing evidence,' " *Abbott Laboratories* v. *Gardner,* 387 U. S., at 141, that this result is compelled by the Act Congress passed to implement that intention.

It is true that today's decision does not quite spell the end of all hope that the South Carolina Senate will someday be representative of the entire citizenry of South Carolina. If the Decennial Census in 1980 requires substantial reapportionment, and if the Voting Rights Act is still in effect when that reapportionment takes place, and if the then Attorney General is conscientious, the devices approved today will be rejected under the strict standards of § 5. See *Georgia* v. *United States,* 411 U. S., at 531. But see *Beer* v. *United States,* 425 U. S. 130 (1976). This highly contingent possibility that the promise of the Fifteenth Amendment will be realized in South Carolina, some 110 years after that Amendment was ratified, is apparently sufficient in the eyes of the majority. It is not sufficient for me, as it was not for Congress, which wrote the Voting Rights Act in 1965 to put an end to what was then "nearly a century of widespread resistance to the Fifteenth Amendment." *South Carolina* v. *Katzenbach, supra,* at 337.

MR. JUSTICE BLACKMUN, dissenting.

In *Harper* v. *Levi,* 171 U. S. App. D. C. 321, 520 F. 2d 53 (1975), the United States Court of Appeals for the District of Columbia Circuit held that the Attorney Gen-

eral's decision not to make an independent assessment of South Carolina Act 1205 is reviewable under the circumstances of this case, and that § 5 of the Voting Rights Act of 1965 requires him to make an independent determination on the merits of the § 5 issues. See *ante,* at 497–498. For the reasons stated by the majority opinion in *Harper* v. *Levi,* I dissent.