STATE OF MISSISSIPPI, Plaintiff,

v.

William French SMITH, Defendant,

Henry J. Kirksey, et al., Intervening Defendants.

Civ. A. No. 82–0956.

United States District Court, District of Columbia.

June 28, 1982.

Jerris Leonard, Kathleen Heenan, Washington, D. C., William A. Allain, Atty. Gen.,

Champ Terney, R. Scott Levanway, Jackson, Miss., for plaintiff.

Gerald W. Jones, Paul F. Hancock, Jeremy I. Schwartz, Robert S. Berman, Dept. of Justice, Washington, D. C., for defendant Smith.

Frank R. Parker, William L. Robinson, Barbara Y. Phillips, Patricia M. Hanrahan, Washington, D. C., Robert Bruce McDuff, Memphis, Tenn., Johnnie E. Walls, Jr., Greenville, Miss., for intervening defendants Kirksey, et al.

Before WRIGHT, Circuit Judge, and GESELL, District Judge.[1]

## MEMORANDUM

The State of Mississippi has filed this action pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c (1976), seeking a declaratory judgment that the 1981 reapportionment of the State's congressional districts (S.B. 2001) "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." *Id.* This matter is now before the Court after full argument on plaintiff's motion for partial summary judgment and plaintiff's motion *in limine* and the respective oppositions thereto filed by the United States and intervening defendants.

Mississippi seeks a determination prior to trial that the nonretrogression principle announced in *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), requires that the effect of the 1981 reapportionment plan must be measured by comparison with the Mississippi reapportionment plan adopted in 1972. Further, by its motion *in limine* Mississippi seeks an order "limiting the evidence on the issue of discriminatory purpose to the legislative process in 1981 which culminated in the development and enactment" of the 1981 plan. In opposition it is urged that the Court must consider in this proceeding pre-1981 evidence of the alleged continuing purpose of Mississippi to discriminate and that the retrogressive effect of the 1981 plan should be measured by comparison with apportionment plans in effect in 1964 or prior thereto.

The crux of this dispute is the claim that Mississippi has divided black voters residing in the so-called Delta Region among several different congressional districts for the purpose of preventing the election of a black to the United States Congress. The Delta Region is a distinct geographical and cultural region in the northwestern part of the State. Although black persons residing in the State comprise only 35.2 percent of the total population, the Delta historically had a high proportion of blacks and according to the most recent Census was majority black in 1980. Given the apparent prevalence of block voting in Mississippi, the United States claims that Mississippi's current apportionment scheme continues to deprive blacks of the opportunity to elect one of their own race to the House.

A brief review of developments in Mississippi will aid understanding of our decision. The stipulated record demonstrates that since the late nineteenth century through the date of enactment of the Voting Rights Act, the Delta Region has been contained in one congressional district despite numerous other districting changes required by changes in population or political considerations over this period. Although blacks were a potential electoral majority in the Delta district under each of these various plans, they exerted virtually no political control because of the State's "long-standing, carefully prepared, and faithfully observed plan to bar Negroes from voting...." *United States v. Mississippi*, 380 U.S. 128, 135–36, 85 S.Ct. 808, 812, 13 L.Ed.2d 717 (1965). In 1964, only 6.7 percent of blacks in Mississippi eligible to vote were registered. As various restrictions on black registration and voting were removed, blacks in the Delta Region gained more and more voting strength.

In 1965 a suit was instituted in federal court, challenging the then-existing 1962 plan as violative of the one-person, one-vote

1. Judge Richey, the third member of the panel, did not participate.

formula. *Connor v. Johnson*, Civ. 3380 (S.D.Miss. October 19, 1965). In response to this litigation the State legislature undertook a comprehensive reapportionment of the State congressional districts. Under the plan adopted by the legislature on April 7, 1966, the Delta Region, which had a longitudinal configuration, was divided horizontally among three districts, eliminating the 59 percent black majority that then existed in the Delta Region. As a result of this reapportionment no district in the State had a majority black voting age population. This plan was submitted to the *Connor v. Johnson* Court, which held that the plan was not racially discriminatory and also satisfied the one-man, one-vote constitutional standard. *Connor v. Johnson*, 279 F.Supp. 619 (S.D.Miss.1966), *aff'd*, 386 U.S. 483, 87 S.Ct. 1174, 18 L.Ed.2d 224 (1967). Although this apportionment plan required preclearance pursuant to section 5 of the Voting Rights Act, *see McDaniel v. Sanchez*, 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981), it was not submitted to the Attorney General for preclearance nor was it the subject of a declaratory judgment action in the United States District Court for the District of Columbia. As a result, the 1966 plan was never scrutinized under Voting Rights Act standards.[2]

Following the 1970 Census the State of Mississippi was required to adopt a new apportionment plan to reflect population changes. In broad outline, however, the State simply reenacted the 1966 plan; each of the State's five congressional districts was majority white in population. The State submitted this 1972 plan to the Attorney General for preclearance pursuant to section 5 of the Voting Rights Act. The Attorney General did not make a factual

determination as to whether the State had demonstrated that the plan "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c. Rather, it was simply indicated:

> The Attorney General will not object to [the 1972 plan]. The basis of this decision is our reading of *Connor v. Johnson*, 279 F.Supp. [619] 620 (S.D.Miss.1966), *aff'd*, 386 U.S. 483 [87 S.Ct. 1174, 18 L.Ed.2d 224] (1967), in which it appears that the courts considered the Fifteenth Amendment implications of a similar Congressional redistricting plan in Mississippi and ruled in favor of the state. Because we feel bound by the decisions of the courts in that case, we do not interpose an objection.

This position was consistent with the then-policy of the Department of Justice not to make a section 5 determination in those instances where the voting change had previously been addressed by a federal district court and found to meet constitutional standards. *See Morris v. Gressette*, 432 U.S. 491, 497, n.8, 97 S.Ct. 2411, 2416 n.8, 53 L.Ed.2d 506 (1977); *Georgia v. United States*, 411 U.S. 526, 535 n.6, 93 S.Ct. 1702, 1707 n.6, 36 L.Ed.2d 472 (1973).

Subsequent Supreme Court decisions reveal the error of this policy. It is now clear that section 5 preclearance procedures must be followed even where there has been a federal court determination that the plan meets constitutional standards. *See McDaniel v. Sanchez*, 452 U.S. 130, 150–51, 101 S.Ct. 2224, 2236–37, 68 L.Ed.2d 724 (1981); *Connor v. Waller*, 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975) (*per curiam*); *Harper v. Levi*, 520 F.2d 53, 69 (D.C. Cir.1975). (Attorney General's deference to

---

**2.** Plaintiff's suggestion that the ruling that apportionment plans are subject to section 5 review, *see Georgia v. United States*, 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973), should only be applied prospectively in light of *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), is entirely without merit. Although the *Allen* Court declined to overturn elections based on various enactments affecting voting which were not clearly within the scope of section 5 prior to

the Court's decision, the Court did not suggest that the enactments could be used in the future either for the purpose of conducting elections or as benchmarks against which to measure future electoral changes under section 5. Indeed, the Court specifically directed the District Courts on remand "to issue injunctions restraining the further enforcement of the enactments until such time as the States adequately demonstrate compliance with § 5." *Id.* at 572, 89 S.Ct. at 835.

constitutional adjudication is "fundamentally inconsistent with clearly expressed congressional intent underlying Section 5"). Indeed, it is now apparent that the *Connor v. Johnson* Court lacked jurisdiction to consider the constitutionality of the plan before it had been precleared pursuant to section 5. *See McDaniel v. Sanchez*, 452 U.S. at 153, 101 S.Ct. at 2238.

In 1981 Mississippi was again required to adopt a new congressional apportionment plan to reflect further population changes disclosed by the 1980 Census. Although the legislature discussed the possibility of recreating a black majority vote in the Delta district this, as well as other alternatives, was rejected. The adopted plan provides for five congressional districts with a configuration virtually identical to the 1966 and 1972 lines; each of these districts is majority white. The plan was submitted to the Attorney General for section 5 review and on March 30, 1982, a timely section 5 objection was interposed. The plan is now before this Court for section 5 review.

In April, 1982, certain black residents of the State of Mississippi, some of whom are also defendant-intervenors in this action, filed suit in the United States District Court for the Northern District of Mississippi seeking to enjoin implementation of the 1981 plan because it had not been approved by the Attorney General or this Court. The plaintiffs also sought to enjoin implementation of the congressional districting plan adopted in 1972 on the ground that the existing districts were unconstitutionally malapportioned. After the parties had fully briefed the issues in this case but prior to oral argument the Mississippi Court issued an opinion holding the 1972 plan unconstitutional as violative of the one-man, one-vote principle and enjoined its use. The Court also enjoined implementation of the 1981 plan pending a determination by this Court that the plan does not violate the Voting Rights Act or until another redistricting plan enacted by the State of Mississippi is precleared in accordance with section 5.

Given the need promptly to establish an electoral scheme to govern imminent congressional primary and general elections and its understanding that this Court could not rule on the 1981 plan for several months, the Mississippi Court ordered into effect an interim plan for the 1982 elections. Based on evaluation of black voting strength under different voting schemes, one-man, one-vote considerations, as well as various state political factors, the Court adopted the so-called Simpson amendment, which was considered but ultimately rejected by the legislature in 1981 in favor of S.B. 2001. The Simpson amendment provides for a black majority district of 53.8 percent centered in the Delta Region. The Simpson plan remains in effect until a redistricting plan enacted by the State of Mississippi is precleared under section 5 of the Voting Rights Act.

As initially presented to the Court upon the briefs, this motion for partial summary judgment raised the issue whether the Court was required to compare the 1981 plan to the 1972 plan or, in the alternative, to the prior plan adopted in 1966, in determining whether the 1981 plan has an impermissible retrogressive effect, or whether instead the proper benchmark for such determination was some other apportionment plan adopted prior to 1966. It is very doubtful that an apportionment plan never reviewed on the merits under section 5 and which in fact is retrogressive compared to the districting scheme in effect on the effective date of the Voting Rights Act can ever serve as a firm benchmark for the purpose of measuring the possible discriminatory effect of subsequent plans. Although certain decisions appear to suggest that the existing plan is at least presumptively the appropriate benchmark, those opinions are distinguishable on their facts from the problem presented here. *See Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976); *United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). Furthermore, it would appear inconsistent with the intent of Congress in requiring section 5 review of every electoral change "different from that

in force or effect on November 1, 1964," 42 U.S.C. § 1973c, to hold that an apportionment plan that is retrogressive as compared to the plan in effect on the effective date of the Act establishes a new benchmark for section 5 review. Whether in fact the 1981, the 1972 or the 1966 plans are retrogressive relative to the apportionment plan in effect on November 1, 1964, can, of course, be resolved only after a full hearing. In any event, the Court finds it unnecessary definitively to resolve these issues, at least at this time, in view of the recent order of the Three-Judge District Court for the Northern District of Mississippi.

The Court holds that whether or not the 1972 reapportionment plan (or prior 1966 plan) can serve as a benchmark, S.B. 2001 must, at a minimum, be shown not to be retrogressive relative to the plan ordered into effect by the Three-Judge Mississippi Court. In *United States v. Mississippi*, 490 F.Supp. 569 (D.D.C.1979), aff'd, 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980), the Court held based on almost identical facts that a judicial plan ordered into effect subsequent to the filing of a section 5 declaratory judgment action should be considered the preexisting plan and at least the initial benchmark against which to assess the effect of the statutory plan, *id.* at 582.[3] We believe that this decision stands for at least this much: a section 5 declaratory judgment should be denied when the electoral plan under review is retrogressive in comparison to a court-ordered plan that will be implemented absent approval of the statutory plan. It would be entirely inconsistent with the teaching of *Beer* to suggest that the Court must accept a statutory plan that increases black voting strength to a lesser degree than a court-ordered plan in effect merely because the court-ordered plan will exist only until another plan is precleared under section 5.

On the present record, it appears that this initial inquiry may be decisive of the issue whether the 1981 plan violates the nonretrogression standard of the Voting Rights Act. Accordingly, we will defer any definitive resolution of the question whether either the 1972 or 1966 plan may serve as a benchmark pending a full factual inquiry into the possible retrogressive effect of the 1981 plan relative to the court-ordered plan. If plaintiff is of the view that it can establish that the 1981 plan is not retrogressive in comparison with the court-ordered plan then this matter must proceed to trial at the earliest possible date. Mississippi's continuing right to seek approval of any plan under section 5 at any time must be fully recognized.

The only remaining issue is whether evidence pertaining to possible discriminatory intent should be limited to the 1981 legislative process or whether evidence of the alleged discriminatory purpose underlying prior apportionment plans and carried forward by S.B. 2001 may be considered. The motion *in limine* will be denied. The value of historical background information for the purpose of assessing present discriminatory intent is well recognized. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–67, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977); *City of Mobile v. Bolden*, 446 U.S. 55, 74, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980). The appropriate weight, if any, to give this evidence can be determined by the Court based on a more complete legal and factual record.

Both the motion for partial summary judgment and the motion *in limine* shall be denied.

---

**3.** We note that the Supreme Court's summary affirmance has only limited precedential value, especially given that the District Court noted in the alternative that the plan under review satisfied the nonretrogression principle when compared to the earlier 1975 plan. 490 F.Supp. at 582 n.6. *See Fusari v. Steinberg*, 419 U.S. 379, 391–92, 95 S.Ct. 533, 540–41, 42 L.Ed.2d 521 (Burger, C. J., concurring) (summary affirmance of three-judge court "affirm[s] the judgment but not necessarily the reasoning"). On the other hand, the affirmance is perhaps due added weight because the three Justices who dissented on the merits explicitly stated that the court-ordered plan was the proper benchmark. *See* 444 U.S. at 1052, 100 S.Ct. at 995 (Marshall, J., dissenting).