**UNITED STATES LEAGUE OF SAVINGS ASSOCIATIONS, Plaintiff,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM et al., Defendants.**

**Civ. A. No. 78–0878.**

United States District Court, District of Columbia.

Oct. 31, 1978.

Daniel J. Goldberg, Washington, D. C., for plaintiff.

Robert J. Franzinger, Dept. of Justice, Washington, D. C., for defendants.

William H. Smith, Washington, D. C., brief amicus curiae in support of defendants on behalf of the American Bankers Ass'n.

Herbert S. Colton, Washington, D. C., brief amicus curiae in support of plaintiff on behalf of National Ass'n of Home Builders.

## MEMORANDUM

GASCH, District Judge.

This is a suit for declaratory and injunctive relief brought by the United States League of Savings Associations (USLSA), a national trade association representing approximately 4,400 state and federally chartered savings and loan associations (S & L's), to challenge regulations recently promulgated by the Board of Governors of the Federal Reserve System (the Board) and by the Federal Deposit Insurance Corporation (FDIC).

On May 1, 1978, the Board amended section 217.5(c) of its Regulation Q,[1] which governs methods of withdrawal from savings deposits, to permit an individual depositor at a federally insured bank to arrange, pursuant to a prior written agreement, for the automatic withdrawal of funds from his savings account and the transfer of such funds to demand deposit or other accounts.[2] This automatic fund transfer (AFT) service may be used to cover overdrafts or to maintain a specified balance in a depositor's checking account. On May 5, 1978, the FDIC, which regulates all federally insured commercial banks that are not members of the Federal Reserve System, adopted similar rules by amending section 329.5(c) of its Rules and Regulations.[3] The amended regulations are scheduled to take effect on November 1, 1978.

---

1. 12 C.F.R. § 217.5(c).

2. The complete text of the amendment reads: Notwithstanding the provisions of subparagraph (1) of this paragraph, withdrawals may be permitted by a member bank to be made automatically or as a normal practice from a savings deposit that consists only of funds in which the entire beneficial interest is held by one or more individuals through payment to the bank itself or through transfer of credit to a demand deposit or other account pursuant to a written authorization from the depositor to make such payments or transfers in order to cover checks or drafts drawn upon the bank or to maintain a specified balance in or to make periodic transfers to such accounts. In accordance with § 217.1(e)(2), a member bank must reserve the right to require the depositor to give notice in writing of an intended withdrawal not less than 30 days before such withdrawal is made. Such notice shall be prominently disclosed and specifically brought to the depositor's attention at the time the automatic transfer service is authorized. A member bank may not require a depositor to authorize such automatic transfers to be made from savings deposits. 43 Fed.Reg. 20002 (May 10, 1978). The Board has expressed its intent to monitor the effects of the automatic transfer service, especially its effect on the competitive structure among banks and thrift institutions. Not later than one year after the effective date, the Board will review its findings and report to the public. *Id.*

3. 12 C.F.R. § 329.5(c). The amendment states: An insured nonmember bank may permit withdrawals to be made automatically from a savings deposit that consists of funds deposited to the credit of, and in which the entire beneficial interest is held by one or more individuals, through transfer of credit to a demand or other deposit account of the same depositor pursuant to a written agreement between the bank and the depositor authorizing such payments or transfers in connection with checks or drafts drawn by the depositor upon the bank, or for any other purpose not prohibited by law or regulation. Interest earned on a savings deposit may be transferred pursuant to the provisions of this subparagraph whether or not the depositor is an individual. In accordance with Section 329.-1(e)(1)(iii) of this Part 329, the bank must reserve the right to require the depositor to give notice in writing of an intended withdrawal (transfer) not less than 30 days before such withdrawal (transfer) is made. This reservation shall be expressly set forth in the written agreement authorizing transfers pursuant to this subparagraph. The bank may not require the depositor to enter into an agreement providing for the automatic transfer of savings deposits as a condition to maintaining a savings or other deposit account. 43 Fed.Reg. 20223 (May 11, 1978).

Plaintiff USLSA has challenged these regulations on the ground that they violate the statutory prohibitions against the payment of interest on demand deposits[4] and against withdrawal by negotiable instrument from interest-bearing savings deposits.[5] It notes that under the plan created by the amended regulations a check drawn on a demand deposit with insufficient funds would be covered automatically by a transfer from the drawer's savings deposit. The regulations do not require either a service charge for such transfers or a forfeiture of interest on the funds transferred.[6] Because funds needed to cover a check can remain in an interest-bearing savings deposit until the check is presented for payment, plaintiff contends that the demand deposit account, which can be maintained with a zero balance, will be a mere conduit between the savings deposit and the payee named in the check. The USLSA characterizes AFT services as a "device" for allowing banks to pay interest on demand deposits and for permitting withdrawals by negotiable instruments from interest-bearing deposits in violation of statutory prohibitions. Because of the threatened economic injury to savings and loan associations if the regulations take effect,[7] plaintiff has brought this suit for declaratory and injunctive relief.

Defendants deny this characterization and maintain their regulations preserve the longstanding distinction between interest-bearing savings deposits and noninterest-bearing demand deposits because the AFT regulations require the bank to reserve the right to require a depositor to give at least thirty days' notice of withdrawal from AFT accounts. They also urge that there is no violation of the prohibition against third-party payment from savings deposits because separate savings and checking accounts must be maintained and negotiable instruments are drawn only against the checking account. This matter is presently before the Court on defendants' motion to dismiss or, in the alternative, for summary

---

**4.** 12 U.S.C. § 371a (1976).

**5.** 12 U.S.C. § 1832(a) (1976). Under this section, federally insured banks and S & L's may not permit depositors to draw negotiable instruments against interest-bearing accounts except in the six New England states where such accounts, known as NOW (Negotiable Order of Withdrawal) accounts, are allowed by express statutory authorization. Pub.L.No. 94–222, 90 Stat. 197 (1976). Recent congressional action would permit such accounts in New York as well. H.R.14279, Financial Institutions Regulatory and Interest Rate Control Act of 1978, title XIII, 95th Cong., 2d Sess. (1978), 124 Cong.Rec. H13040 (Oct. 14, 1978). These limited exceptions have been allowed in states in which state-chartered savings banks and savings and loan associations are permitted to offer checking accounts. By such legislation Congress seeks to protect the competitive position of federally regulated savings and loan associations, which would be placed at a disadvantage if they did not possess similar third-party payment powers. *See* S.Rep.No. 93–149, 93d Cong., 1st Sess. 2–5, *reprinted in* [1973] U.S. Code Cong. & Admin.News pp. 2014, 2015–16.

**6.** As originally proposed, the amendment required the forfeiture of interest in an amount no less than the interest actually earned during the previous 30 days on the funds transferred from savings to checking accounts. 43 Fed. Reg. 5008 (February 7, 1978). The final rule adopted by the Board does not require the imposition of an interest forfeiture, but the Board has encouraged member banks to develop charges for automatic transfers to reflect the costs of providing the service to depositors. 43 Fed.Reg. 20002 (May 10, 1978). Proposed AFT plans impose these costs in a variety of ways, either by requiring minimum balances in savings or checking accounts, by charging a flat monthly fee for the service, or by collecting a small fee for every transfer or for every day a transfer is made, regardless of the number. *See* Wash. Post, Oct. 29, 1978, § F, at 1.

**7.** Plaintiff maintains that a significant erosion of deposits from S & L's would occur if the interest rate paid by commercial banks on automatic transfer savings accounts approached the interest rate paid by savings and loan associations on passbook savings accounts. Complaint for Injunctive and Declaratory Relief, ¶ 20. This shift in funds from one type of financial institution to another, such as the transfer of money from S & L's to banks, is known as disintermediation. The parties have stipulated that the staff of the Federal Reserve System advised the Board of Governors at an open agency meeting that with the initiation of automatic funds transfer accounts $10 billion of thrift savings balances would be vulnerable to conversion to bank savings deposits during the four year period under consideration. Plaintiff's Summary Judgment Motion, Exhibit A.

judgment and plaintiff's cross-motion for summary judgment.

## FACTUAL BACKGROUND

The Federal Reserve Board, which was established by the Federal Reserve Act of 1913,[8] is the agency of the federal government authorized by Congress to supervise and regulate commercial banks that are members of the Federal Reserve System.[9] The Federal Deposit Insurance Corporation has similar statutory responsibility for supervising and regulating all banks insured by it that are not members of the Federal Reserve System.[10] As a result, the regulations of these two bodies govern the activities of virtually all commercial banks in the United States.

The Federal Reserve Act of 1913 specifically defined the terms "demand deposit" and "savings deposit" and prescribed separate reserve requirements for each.[11] Savings deposits were subject to the legal right of the bank, at its discretion, to require a depositor to give at least thirty days' notice before withdrawing funds from the account. In contrast, demand deposits were not subject to any such requirement. The Banking Act of 1935,[12] however, repealed the statutory definitions of "savings deposit" and "demand deposit" that had appeared in the 1913 Act and substituted provisions granting the Board and the FDIC authority to define such terms.[13] In addition, they

were authorized to determine what shall be deemed a payment of interest, and to prescribe rules and regulations "necessary to effectuate the purposes of this section and to prevent evasions thereof." [14] Board regulations relating to deposits and the payment of interest by member banks are known collectively as Board "Regulation Q." Since 1936 Regulation Q and the corresponding FDIC regulations have continued to distinguish savings deposits and demand deposits on the basis of the bank's right to require "notice in writing . . . not less than 30 days before such withdrawal is made" from savings accounts.[15]

On March 15, 1976, the Board and the FDIC published for comment proposals authorizing AFT that were essentially the same as the regulations challenged here.[16] No further action was taken on these proposals and on February 7, 1978, the Board republished for comment its proposal to authorize member banks to offer AFT plans.[17] The Board received a record number of comments on the AFT proposal,[18] and after considering the responses, adopted the amendments permitting automatic fund transfers on May 1, 1978. The FDIC took similar action on May 5, 1978. In adopting the challenged regulations, the Board stated that AFT would benefit the public by providing an additional and convenient means of savings withdrawal service and would also increase the efficiency of the Federal Reserve System's check clearing operations

---

8. Pub.L.No. 63–43, ch. 6, 38 Stat. 251 (1913).

9. 12 U.S.C. §§ 221 et seq. (1976).

10. 12 U.S.C. §§ 1811 et seq. (1976).

11. Pub.L.No. 63–43, ch. 6, 38 Stat. 251 (1913).

12. Pub.L.No. 74–305, 49 Stat. 684 (1935).

13. 12 U.S.C. §§ 461, 1828(g) (1976).

14. Id.

15. Compare 12 C.F.R. §§ 217.1(e)(2), 329.-1(e)(1)(iii) (1978) (defining time deposits) with 12 C.F.R. §§ 217.1(a), 329.1(a) (1978) (demand deposits include every deposit that is not time or savings deposit).

16. 41 Fed.Reg. 12039 (March 23, 1976).

17. 43 Fed.Reg. 5008. The FDIC did not publish a separate proposal for amending its regulations, but invited comments on the Federal Reserve Board proposal. Id. at 7705.

18. Of the 1,380 comments received, 721, or 52.2%, favored the proposal. Broken down by categories, 517 comments were from individuals, with 82% in favor of the proposal; 382 were from commercial banks, with 66.5% in favor of the proposal; and 370 were from savings and loan associations, with 100% opposed to the proposal. 43 Fed.Reg. 20001 (May 10, 1978). The FDIC received 436 comments, of which approximately 50% were in favor of adoption. 43 Fed.Reg. 20222 (May 11, 1978).

by reducing the number of return items processed by the system.[19]

The regulations emphasize that AFT services are available only to individuals and that such services are entirely voluntary, both on the part of the bank and of the customer. The amended regulations require that any bank offering the AFT service reserve the right to require thirty days' notice before withdrawal and to disclose prominently and specifically the legal right of the bank to demand such notice.[20] Because of this requirement, the Board concluded that the amendment did not alter the basic distinction between savings and demand deposits and thus did not violate the statutory prohibition against the payment of interest on demand deposits. In addressing the argument that the amendments violated the prohibition of 12 U.S.C. § 1832 against negotiable orders or third-party payments from savings accounts, the Board concluded that the new regulations provide a withdrawal service that is "identical in its essential elements to withdrawal services that banks already are authorized to offer to depositors such as withdrawals in person or via telephone."[21] Plaintiff contends, however, that bank plans utilizing AFT services are being merchandized and are generally perceived as interest-bearing checking accounts.[22]

## MERITS

### A. Judicial Review.

■ Defendants have moved to dismiss plaintiff's complaint on the ground that the subject matter of the challenged regulations is committed to agency discretion by law and therefore is not subject to judicial review. Section 10(a)(2) of the Administrative Procedure Act[23] exempts from judicial review any action by an agency that is committed to the discretion of the agency by law. This exemption, however, is a very narrow exception applicable only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971).

Defendants argue that the Federal Reserve Act and the Federal Deposit Insur-

---

**19.** 43 Fed.Reg. 20001 (May 10, 1978). The Board staff has estimated a cost savings of $4 to $6 million per year from a reduction in the number of checks returned due to insufficient funds. Memorandum to the Board from its Legal Division and Division of Federal Reserve Bank Operations (October 22, 1975), Federal Reserve Board Administrative Record, at 22.

**20.** 43 Fed.Reg. 20002 (May 10, 1978).

**21.** *Id.* In recent years there has been a liberalization of methods of withdrawing funds from savings deposits. In 1961 the Board and the FDIC codified a longstanding ruling that allowed depositors to prearrange with their banks to make automatic withdrawals from savings deposits for the purpose of paying installments of principal, interest, or other charges due on a real estate loan or mortgage. 26 Fed.Reg. 12031 (Dec. 15, 1961). In April, 1975 the Board adopted an interpretation of Regulation Q that permitted a depositor to withdraw funds from a savings account at an insured bank by telephone. 40 Fed.Reg. 16831 (Apr. 15, 1975). At the same time, the Federal Home Loan Bank Board (FHLBB), which regulates federally insured S & L's, authorized its members, which are prohibited from offering checking accounts, to offer bill payer services pursuant to which a depositor may arrange in advance for an S & L to pay bills from the depositor's savings account or to transfer funds to any account at a commercial bank without any further action by the depositor. 12 C.F.R. § 545.4–1 (1978). In response to this amendment, the Board in July, 1975 and the FDIC in August, 1975 authorized commercial banks to offer similar bill payer services, except that authority to transfer funds automatically to a depositor's checking account to cover overdrafts or to maintain a minimum balance was withheld. 12 C.F.R. §§ 217.5(c), 329.5(c) (1978).

**22.** Many newspaper reports discussing the new AFT regulations have characterized their adoption as a move by the Board and the FDIC to let banks pay interest on checking accounts. *See* Appendix to Consolidated Points and Authorities in Opposition to Defendants' Alternative Motions to Dismiss or for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment at A5–1 to A5–38. A number of bank advertisements promoting AFT services have described them as "interest on your checking account" and "as close as we can legally come to paying interest on checking." *Id.* at A9–1 to A11–1.

**23.** 5 U.S.C. § 701(a)(2) (1976).

ance Act demonstrate a clear legislative intent to leave regulation of the practices involved here to the federal agencies, because the only standards to be applied in reviewing defendants' actions are legal standards that are to be defined by the defendant agencies. In further support of this argument, they note that in 1935 Congress abolished the statutory definitions of savings and demand deposits and contemporaneously enacted legislation granting agencies the right to define these terms.[24] They suggest that this conduct indicates a congressional intent to vest exclusive discretion over the area with the expert agencies.

In response, plaintiff maintains that there is specific governing law to apply in this case, namely, 12 U.S.C. § 371a, which states that "no member bank shall, directly or indirectly, by any device whatsoever, pay any interest on any deposit which is payable on demand . . ." and 12 U.S.C. § 1828(g), the corresponding provision of the Federal Deposit Insurance Act. It suggests that these statutes delineate the scope of the agencies' discretion and the legal standards by which their conduct is to be judged.

■ The presumption favoring district court jurisdiction to review actions of federal agencies is not easily overcome and will not be cut off unless there is "persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); *see Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In one of the most recent Supreme Court discussions of this issue, the Court held that it is necessary to review the statutory authority involved in order to determine "whether nonreviewability can fairly be inferred [from the statute]." *Morris v. Gressette*, 432 U.S. 491, 501, 97 S.Ct. 2411, 2419, 53 L.Ed.2d 506 (1977). In making this determination, the specific statute in question should be examined "within 'the context of

the entire legislative scheme'." *Id.* at 501, 97 S.Ct. at 2419.

■ The specific statute at issue in *Morris* was section 5 of the Voting Rights Act of 1965,[25] which establishes two alternative methods by which states subject to the Act can obtain federal preclearance review of a change in their voting laws. The Court concluded that because of the "unusual" and "severe" nature of the section 5 remedy and its legislative history, it was clear that Congress intended to provide states with an expeditious alternative to declaratory judgment actions by allowing submission to the Attorney General. Because judicial review of the Attorney General's action would necessarily and unavoidably extend the time period specified in the statute, the Court held that such review was precluded. *Id.* at 504–05, 97 S.Ct. at 2420.

Here neither the statutory language nor the legislative history of the Banking Act of 1935 indicates a similar congressional intent to preclude judicial review. Therefore, the strong presumption favoring judicial review should govern here.

### B. *Standing.*

■ Defendants also seek dismissal of the present action on the ground that plaintiff lacks standing to sue. Because USLSA brings this suit in a representative capacity on behalf of its members, it must establish that its individual members would satisfy the requirements of standing if the members themselves had brought the action. *Simon v. Eastern Kentucky Welfare Rights Organizations*, 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). The current test of standing, enunciated by the Supreme Court in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), requires the complaining party to show the challenged action will result in "injury in fact" and that the interests that the party seeks to protect are arguably within the

---

**24.** Pub.L.No. 74–305, ch. 614, 49 Stat. 684 (1935).

**25.** 42 U.S.C. § 1973c (1970 & Supp. V 1975).

"zone of interests" to be protected and regulated by the particular statute.

Here, plaintiff has alleged that it represents over 4,400 S & L's, which hold over 98% of the total assets held by all savings and loan associations in the United States,[26] and that the regulations promulgated by defendants are likely to produce disintermediation of savings and loan assets of at least $10 billion. For the purposes of ruling on a motion to dismiss for lack of standing, the trial court must accept as true all material allegations of the complaint. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). It is well-established that threatened economic injury produced by unlawful competition raises a justiciable controversy and that a trade association has standing to challenge such action on behalf of its members.[27]

Although plaintiff USLSA satisfies the "injury in fact" requirement of standing, it still must satisfy the requirement that it is within the "zone of interests" sought to be protected by the applicable statute. A recent opinion of this circuit interpreting this requirement held that "the particular statutory section should be the focus of analysis when applying the zone test" and that litigants cannot " 'borrow' the arguable regulatory or protective intent embodied in one provision . . . and apply it to a provision where that intent is not evident, in order to satisfy the zone test." *Tax Analysts & Advocates v. Blumenthal,* 184 U.S.App.D.C. 238, 249, 566 F.2d 130, 140–41 (1977). An amicus curiae brief filed by the American Bankers Association in support of defendants' motion to dismiss argues that the *Tax Analysts* decision limits the USLSA to the specific statutory sections which it claims forbid the challenged regulations—12 U.S.C. §§ 371a, 1828(g) and 1832—as a source of congressional intent to safeguard the competitive

position of savings and loan associations. Therefore amicus urges that plaintiff cannot borrow this intent from a wholly unrelated aspect of federal banking laws—the statutory differential in interest rates permitted on savings accounts offered by S & L's and by commercial banks.[28]

In the *Tax Analysts* decision, however, the Court of Appeals indicated that it is appropriate to examine both particular and general provisions of a statutory scheme when these provisions share an "identity of purpose." 566 F.2d at 140. The Court determined that this approach was not appropriate in the case before it, which involved the Internal Revenue Code, because the Code is an extraordinarily complex document that does not have a single unified purpose, but instead is intended to accomplish a wide variety of social and economic goals. *Id.* at 141. The Court concluded that if litigants were allowed to transfer the congressional intent and purpose embodied in one section of the Code into other contexts regulated by different provisions of the Code, endless litigation would result. *Id.*

Unlike the multi-purpose Internal Revenue Code, the provisions of the federal banking laws all reflect the goal of achieving a controlled money supply and regulated competition between financial institutions. Because plaintiff's complaint for declaratory and injunctive relief also reflects these purposes, the Court finds that the interests represented by the USLSA are within the zone of protected interests.

### C. *Summary Judgment.*

Defendants seek summary judgment on the ground that the challenged regulations are a reasonable exercise of the agencies' statutory authority to define deposits, prescribe methods of withdrawal, and regulate the payment of interest on deposits. Plain-

---

**26.** Complaint for Declaratory and Injunctive Relief, ¶ 8.

**27.** *See, e. g., Investment Co. Institute v. Camp,* 401 U.S. 617, 620–21, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Association of Data Processing*

*Service Organizations, Inc. v. Camp,* 397 U.S. 150, 157, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Independent Bankers Ass'n v. Smith,* 175 U.S. App.D.C. 184, 534 F.2d 921, 926 (1976).

**28.** 12 U.S.C. § 461 note (1976).

tiff has cross-motioned for summary judgment, claiming that defendants, by adopting the AFT regulations, acted in excess of and contrary to their statutory authority and that consequently their action was arbitrary and capricious.

■ Plaintiff's central argument is that the AFT regulations violate the statutory prohibition of 12 U.S.C. § 371a, which states: "No member bank shall, directly or indirectly, by any device whatsoever, pay any interest on any deposit which is payable on demand . . . ."[29] It claims that AFT services constitute such a device for the indirect payment of interest and offers the following scenario of how this could be achieved. If a bank offered an AFT plan without service charges, interest forfeiture provisions, required minimum balances, or required minimum transfers, a depositor could maintain a zero balance in his checking account and simply by writing a check, trigger an automatic transfer of funds from his savings account in the exact amount necessary to cover the amount of the check. Using this plan, a depositor could maintain all transactional funds normally kept in a checking account in an interest-bearing savings account without in any way impairing his access to those funds for the purpose of making third-party payments by check.[30]

The above plan probably represents the farthest possible extension of AFT services. Although such plans appear to offer, and indeed, are promoted as offering, "interest on checking accounts," this Court concludes that they do not violate the statutory prohibition of 12 U.S.C. § 371a. Automatic transfer services require the existence of both a savings deposit and a demand deposit. The two accounts are distinguished not solely by the payment of interest but more significantly by the limitation of the right of withdrawal from savings accounts.[31] Indeed, the amount of interest offered on time deposits is inversely related to the limitations on withdrawal imposed by such accounts.[32] This distinction is preserved by the AFT regulations, which require banks to reserve the right to demand thirty days' notice of withdrawal and to bring this requirement specifically to the attention of depositors.

Plaintiff contends that this requirement is "illusory" because it is unlikely to occur given the chaos to financial institutions that would result if the statutory notice period was invoked before withdrawals were permitted. But the imposition of a notice requirement in AFT situations would produce a situation no different than its use with respect to ordinary savings deposits, where the possible disruption of financial services is just as real. Although other courts interpreting unrelated provisions of the banking laws have emphasized that the form of a bank service must not be allowed to mask its substance,[33] this Court finds that the AFT regulations do not constitute a device for the payment of interest on demand deposits.

■ The second major concern voiced by the USLSA is that the automatic funds

---

**29.** This prohibition applies to banks regulated by the Federal Reserve Board. Congress has authorized the FDIC "by regulation [to] prohibit the payment of interest or dividends on demand deposits in insured nonmember banks . . . ." 12 U.S.C. § 1828(g) (1976). The FDIC has adopted a regulation prohibiting the payment of interest on demand deposits that tracks the language of 12 U.S.C. § 371a. 12 C.F.R. § 329.2(a) (1978).

**30.** Some commercial banks in the Washington, D.C. area have already begun promoting "zero balance checking" plans utilizing AFT service. *See* Wash. Post, Oct. 29, 1978, § F, at 5.

**31.** *See* 12 C.F.R. §§ 217.1(e)(2), 329.1(e)(1)(iii) (1978).

**32.** *See* 12 C.F.R. § 217.7 (1978).

**33.** *See, e. g., First National Bank in Plant City v. Dickinson*, 396 U.S. 122, 137, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969) (bank's armored car messenger service and off-premises receptacle for receiving packages containing money constituted "branch" in violation of branch-banking laws); *Independent Bankers Ass'n v. Smith*, 175 U.S.App.D.C. 184, 534 F.2d 921, 938–39 (off-premises "customer-bank communication terminals" were branches; lack of similarity to typical branch was difference in form, not difference in substance or result), *cert. denied*, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976).

transfer regulations violate the statutory prohibition against withdrawals by negotiable instrument for third-party payment from savings accounts. 12 U.S.C. § 1832(a). Under the AFT regulations a bank customer's check drawn on a zero balance account to a third party triggers a withdrawal from the savings account to cover the check. Although the existence of a checking account which serves as a conduit for payment to the third party factually distinguishes an AFT account from statutorily-authorized NOW accounts, plaintiff maintains that the checking account does not prevent the AFT-linked accounts from functioning as a NOW account.

Although plaintiff attempts to minimize the significance of the checking account linked to AFT service, its importance cannot be ignored. Two accounts are required to operate the AFT service and no negotiable orders are drawn on or third party payment made from the savings deposit. Defendants have suggested that AFT is merely an extension of the telephone transfer bill payer services. Telephone transfer permits a bank to transfer a depositor's funds from a savings to a demand deposit account pursuant to transfer instructions conveyed by telephone.[34] Under AFT plans, such transfers would be automatically triggered on the basis of a prior authorization rather than requiring an individual telephone conversation for each transaction.

AFT services also resemble bill payer services, for in both the depositor's bank withdraws funds from the depositor's account on the basis of a single prearrangement with the depositor, on an automatic basis, and without any further participation or action by the depositor.[35] The only difference is that bill payer services send the withdrawn funds by check or direct deposit to the depositor's creditors while funds withdrawn by AFT are added directly to the depositor's demand deposit account.

After oral argument of the parties' cross-motions for summary judgment was held in this case, both houses of Congress enacted a bill entitled "The Financial Institutions Regulatory and Interest Rate Control Act of 1978." [36] Defendants urge that the passage of this bill indicates congressional awareness of the AFT regulations and that body's intent to defer to defendant agencies' expertise in the affected subject areas. The Court cannot agree with this characterization. In its report discussing the interest rate differential provision, the Senate Committee on Banking, Housing, and Urban Affairs declared that the proposed bill "is not intended to authorize automatic transfer accounts nor to preclude a finding by a court of competent jurisdiction that such accounts are either permissible or impermissible under existing law." [37] During the House debate on the measure, explicit recognition was given to the present litigation

34. 12 C.F.R. § 217.152 (1978).

35. 12 C.F.R. §§ 217.5(c)(1)(vii), 329.5(c)(1)(vi) (1978).

36. H.R.14297, 95th Cong., 2d Sess. (1978), 124 Cong.Rec. H13040 (Oct. 14, 1978). As of the date of this memorandum, the enrolled bill has not yet been signed or vetoed by President Carter. By its Order of October 19, 1978, the Court directed the parties to this action to submit supplemental memoranda addressing the impact, if any, of this bill on the present litigation should it become law.

The bill contains three provisions that make reference to AFT services. Section 104 of Title 1 of the bill provides that preauthorized transfers pursuant to an AFT agreement shall not constitute the payment of an overdraft that would violate the bill's prohibition against a member bank's payment of overdrafts of its executive officers or directors. Section

903(b)(D) of Title XX of the bill excludes AFT transfers between accounts from the provisions of the Electronic Funds Transfer Act, which establishes a regulatory framework for EFT systems. Title XVI of the bill eliminates the interest rate differential on savings deposits enjoyed by mutual savings banks, which are also permitted to offer checking services, if the two accounts are linked by AFT. Without this legislation, nothing would prohibit mutual savings banks offering checking accounts from entering into an AFT agreement with customers that would permit automatic transfers from a 5¼% savings account to a checking account even though all other institutions offering similar services, including NOW accounts, would be limited to a 5% interest ceiling.

37. S.Rep.No. 95–1273, 95th Cong., 2d Sess. 3 (1978).

challenging the legality of the AFT regulations and no opinion was expressed on the question.[38] The passage of "The Financial Institutions Regulatory and Interest Rate Control Act of 1978" thus cannot be viewed as in any way dispositive of the legal questions raised by AFT services.

 The final issue raised by plaintiff is that defendants acted arbitrarily and capriciously in adopting the AFT regulations. The specific claim is that it cannot be determined from the record whether defendants gave proper consideration to the competitive impact of AFT plans and to the impact of such plans on deposit reserve policies.[39] The arbitrary and capricious standard is the most limited form of judicial review over agency actions and the scope of such review is narrow and highly deferential to the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Here the administrative record of the Board proceedings alone comprised over 400 pages in addition to the almost 1,400 written comments received on AFT services.[40] Given such a fully developed record and the widespread attention the AFT proposals have received at every stage of their consideration, there appears to be no support for plaintiff's argument that the decision on AFT services was arbitrary and capricious except for the agencies' lack of agreement with plaintiff's position.

In conclusion the Court finds that automatic fund transfer regulations do not violate the statutory prohibitions against the payment of interest on demand deposits or against negotiable instruments drawn on savings deposits. This result is supported by the convenience and other benefits AFT services will produce for bank customers and by the role such services will play in reducing the number of checks returned for insufficient funds. Therefore, defendants' motion for summary judgment is granted and all other motions are denied.

---

**38.** 124 Cong.Rec. H13075 (daily ed. Oct. 14, 1978) (remarks of Rep. Rousselot).

**39.** As one means of controlling the money supply, Congress has mandated that member banks of the Federal Reserve System maintain certain minimum reserves with respect to demand and savings deposits. 12 U.S.C. § 461(b) (1976). The Board has always required significantly larger reserves for demand deposits than for savings deposits. For example, on December 31, 1977, the Board's regulations required a 7% to 16¼% range of reserves for demand deposits but reserves of only 3% for savings deposits. 64 Fed.Res.Bull. A9, Table 1.15 ("Member Bank Reserve Requirements") (Jan. 1978). Plaintiff contends that initiation of AFT services will result in a shift of funds from checking accounts to linked savings accounts that will free up reserves in an amount equal to the difference between the reserve requirements for the respective accounts.

**40.** *See* note 18 *supra.*