**AMERICAN HORSE PROTECTION ASSOCIATION, INC., et al.**

v.

**James G. WATT, Secretary, United States Department of the Interior, et al., Appellants.**

**No. 82–1070.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 9, 1982.

Decided Dec. 10, 1982.

James P. Leape, Atty., Dept. of Justice, Washington, D.C., with whom Dirk D. Snel, Atty., Dept. of Justice, Washington, D.C., was on the brief for appellants, Watt, et al.

Russell J. Gaspar, Washington, D.C., for appellees.

Murdaugh Stuart Madden and Roger A. Kindler, Washington, D.C., also entered an appearance for appellees, Humane Society of the United States.

Before ROBINSON, Chief Judge, and WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Opinion, dissenting in part, filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

GINSBURG, Circuit Judge:

The Bureau of Land Management ("BLM")[1] manages a herd of wild horses that roams public lands near Challis, Idaho. In 1976 the district court permanently enjoined BLM from removing horses from the range without the court's approval. This is an appeal from the district court's November 19, 1981, order denying the Agency's motion to dissolve the 1976 injunction. We find no error in the district court's determination that BLM has not complied with instructions the district court supplied in its 1976 decree. But we hold that a 1978 change in the governing statute has superseded the court instructions at issue and compels a remand for prompt reconsideration of the Agency's motion.

## I. BACKGROUND

In 1971 Congress enacted the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), 16 U.S.C. §§ 1331–1340. The Act responded to the congressional concern that wild horses and burros, "living symbols of the historic and pioneer spirit of the West," were "fast disappearing from the American scene." 16 U.S.C. § 1331. The legislation extended federal protection to wild horses and empowered BLM to manage horses roaming public ranges as a part of the Agency's management of the public

---

1. "BLM," "the Agency," and "the Secretary" are used interchangeably in this opinion.

lands. At the time Congress passed the Act the Challis herd numbered 150.[2]

The Challis public lands comprise 330,122 acres.[3] Wild horses range on about 197,330 acres of that terrain;[4] of that area, 146,214 acres make up the range accessible to horses in winter.[5] The limited forage on the winter range determines the maximum number of wild horses that can survive on the Challis-area lands.[6] In its current condition, with cattle competing for forage on the winter range in the summer, the winter range can, without significant deterioration of the range, support a stable herd of about 340 horses.[7]

In 1976 BLM proposed to reduce the Challis herd (numbering, according to a 1975 count, 407 horses) to the 1971 herd size of 150 animals. The American Horse Protection Association ("AHPA") challenged the Agency's plan. The district court enjoined the removal of horses by BLM, for the following reasons:[8]

a) The Wild Horse Act's section 1333(a) mandate of "minimal feasible level[s]" of management by the Agency required BLM to consider "*all* alternative courses of action" that would affect the wild horse population less severely than would the proposed roundup and removal. Restricting cattle grazing on the horses' winter range—an option BLM had failed to consider closely—was a viable alternative that might achieve greater protection of the horses with less management by the Agency, and that therefore merited "full and careful consideration."[9]

b) BLM's plan was based on inadequate data on horse population and other herd characteristics.[10]

c) BLM failed adequately to consider means of population control that might reduce the need for periodic removal of horses, for example, concentrating roundup efforts on fertile mares.[11]

d) BLM failed to provide for on-site veterinary assistance during the roundup, violating the Wild Horse Act's requirement that removal measures be humane.[12]

e) BLM proposed to round up horses before completing an environmental impact

---

2. Department of the Interior, Bureau of Land Management, Idaho State Office, Final Supplemental Environmental Statement on a Revised Range Management Program for the Challis Planning Unit [hereinafter, "FSES"] 29.

3. *Id.* at 1–1.

4. *Id.* at 2–49.

5. *Id.* These figures differ somewhat from those relied on by the district court in 1976. The district court's 1976 opinion, No. 76–1455 (D.D.C. Sept. 9, 1976) [hereinafter "1976 Opinion"], is reported at 6 Envir.L.Rep. 20802 (December 1976). The court found in 1976 that the entire Challis unit comprised 260,000 acres, that horses ranged on 168,648 acres, and that the winter range comprised 91,642 acres. *See* 1976 Opinion, finding of fact 12, *id.* at 20803.

6. *Id.*, finding of fact 13; FSES at 8–14.

7. FSES at 8–14 to 8–15.
   A limiting factor of maintaining the wild horse herd within the area . . . is the winter range. Inventory data indicates that the area can support 340 wild horses. The present number of wild horses (586) is overstocking the winter range. [The data] indicate [ ] the wild horse range would be over grazed by . . . about 246 animals [if present horse population levels were maintained]. The quality and quantity of forage would decrease due to overgrazing and the range would be severely damaged. [Citation omitted.] The damaged range would eventually produce malnutrition die-offs and migration of horses to other habitat[s]. . . . Spring, winter and fall grazing by livestock at the present stocking level would remove forage needed for wild horses. *Id. See also* 1976 Opinion, finding of fact 13, 6 Envir.L.Rep. at 20803.

8. 1976 Opinion, *supra* note 5. The basis for the court's 1976 review was the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

9. 1976 Opinion, 6 Envir.L.Rep. at 20804, conclusions of law 2–5; *see also id.,* findings of fact 29–33.

10. *Id.,* conclusion of law 6. Neither AHPA nor the district court has relied on this element of the 1976 decision to question BLM's general claim of compliance with the injunction.

11. *Id.,* finding of fact 28 and conclusion of law 7.

12. *Id.,* conclusion of law 8. Neither AHPA nor the district court has relied on this element of the 1976 decision to question BLM's general claim of compliance with the injunction.

statement ("EIS") then under preparation by the Agency.[13]

In the period 1976–78 BLM studied the management of the Challis lands and weighed alternative control strategies. BLM followed its "Management Framework Plan" ("MFP"). This process involved: conducting a preliminary analysis of the resources available; MFP-Step 1—proposing alternative courses of action; MFP-Step 2—analyzing these alternatives, assessing environmental impacts, and arriving at compromise proposals; MFP-Step 3—formulating a Range Management Plan ("RMP") and assessing its impacts.[14] BLM's "Final Supplemental Environmental Statement" ("FSES"), which analyzed alternatives and specified the Agency's "Proposed Action," was filed in November 1978; a "Summary Report" of BLM's final (revised) Range Management Program issued in March 1979. Appendix (App.) 25–39.[15]

By 1979 the herd had grown to 767 animals. BLM, under the district court's supervision, agreed with AHPA to remove only 167 horses that year, about half the number the Agency had planned to cull.

Under a similar agreement BLM removed 307 horses in 1980. On both occasions the district court refused to dissolve the 1976 injunction.

In 1981 BLM proposed to cull a further 200 horses from the then 400-animal herd. The district court denied permission.[16] It found that BLM had failed to comply with the court's 1976 decision instructing the Agency to give serious, detailed consideration to the possibility of protecting the horses' winter range by restricting cattle grazing. Further, the court rejected BLM's argument that 1978 amendments to the Wild Horse Act superseded the 1976 judicial stop order against removals pending careful study of a winter range management plan. Based upon these two determinations the court ordered that the 1976 injunction remain in full force and effect.

## II. COMPLIANCE WITH THE 1976 INJUNCTION

BLM contends initially that it accorded sufficient consideration to protecting the wild horse winter range and thereby adequately complied with the 1976 decree.[17]

---

**13.** *Id.,* conclusion of law 9. The district court held it would violate the National Environmental Policy Act for the Agency to proceed with the roundup before completing the EIS. In a separate 1974 proceeding before a different judge, the district court had ordered BLM to prepare an EIS addressing the Challis and related range management plans. *Natural Resources Defense Council, Inc. v. Morton,* 388 F.Supp. 829 (D.D.C.1974), aff'd, 527 F.2d 1386 (D.C.Cir.1976); cf. *American Horse Protection Ass'n v. Andrus,* 608 F.2d 811 (9th Cir.1979) (wild horse roundup potentially a major federal action requiring preparation of an EIS prior to action). BLM completed this EIS in November 1978. Thus the continuance of the 1976 injunction against removal of wild horses can no longer be predicated on non-completion of the EIS. The adequacy of the EIS is not at issue here.

**14.** A description of the MFP procedure appears at FSES A–1 to A–2.

**15.** The "Proposed Action"—the "Revised Range Management Program" for the Challis area lands—analyzed in the FSES was not the final RMP formulated by the Agency. After the draft FSES was completed in August 1978, Congress enacted the Public Rangelands Improvement Act, Pub.L. 95–514, 92 Stat. 1803 (Oct. 25, 1978). That Act contained a "range improvement" appropriation, and BLM earmarked $350,000 dollars for improving the Challis range. The Agency then modified its FSES "Proposed Action" to reduce adverse impacts on cattle grazing; changes are reflected in the final RMP.

**16.** Memorandum opinion, Civ. No. 76–1455 (D.D.C. Nov. 19, 1981).

**17.** BLM blends this argument with others. In its briefs the Agency urges this court to hold that the final RMP is not arbitrary and capricious. BLM Brief at 16–23. The "arbitrary and capricious" argument appears to invite review of the district court's 1976 findings of fact and conclusions of law. The invitation comes too late. BLM dismissed its appeal from that decision prior to briefing (No. 77–1241, D.C. Cir.), and may not now present argument it might have tendered had it elected to pursue the earlier appeal. BLM's counsel apparently recognized at oral argument that this appeal is limited to two inquiries:

Q. Your theory is that ... if anybody objects to what you've done under the statute they should take a direct appeal ... under the APA?
A. Yes. I guess our argument is, first, that we have complied with the injunction. But

But the district court, after a hearing, found that the Agency "fail[ed] to give full consideration to alternatives involving the restriction of livestock grazing on the crucial winter range areas,"[18] and thus failed to fulfill the 1976 mandate. On the record before us, that finding is well supported.

■ We note at the outset that the question whether BLM gave "full and careful" consideration to restricting livestock grazing on the winter range is largely one of fact. District court adjudications of such questions should be reviewed under a "clearly erroneous" standard. *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 417, 97 S.Ct. 2766, 2774, 53 L.Ed.2d 851 (1977); *Booker v. Special School District No. 1*, 585 F.2d 347, 353 (8th Cir.1978), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 878 (1979). The district court heard the testimony of, and questioned BLM's experts; this court of review will not second-guess the trial court's skeptical assessment of testimony that court witnessed. Moreover, the documentary evidence abundantly supports the determination that BLM had not met the district court's command.

The 1976 injunction contemplated the possibility of a stable herd comprising more than the 340 horses that the winter range in its current condition can support. The Agency was to consider the possibility that cattle might be excluded from the winter range, leaving more winter forage for the horses.[19] The record securely indicates that BLM did not extensively consider eliminating or reducing livestock grazing on the winter range.

In MFP-Step 1 the Agency advanced two alternative strategies for protecting the winter range: eliminating cattle altogether from that range, and using fencing to segregate cattle and wild horses competing for the winter range's resources. Both approaches were rejected by BLM in MFP-Step 2, the first because it would have too great an impact on the local economy, the second because fencing was judged too expensive and likely to interfere with wildlife migration. The analysis and resulting rejection of both plans to protect the winter range occupied two pages of the agency record.[20] The "Revised Range Management Program" and other alternatives presented in the FSES and the final RMP do not consider the possibility of fencing the winter range.[21] BLM, the written record thus suggests, proceeded with dispatch in rejecting winter range strategies, and was reti-

in any case the injunction is now no longer supported by statute because of the '78 amendments and should have been dissolved for that reason alone. And that any further challenge not based on the '76 injunction would have to be brought in a separate action.
Q. Under an arbitrary and capricious standard?
A. Yes.
The Wild Horse Act does not provide for direct review by courts of appeals. Since the APA provided the basis for district court review in 1976, and that court retained authority with respect to AHPA's complaint, no new action need be filed to secure further review, in the district court, of BLM's current plans for the Challis area. *See also infra* note 41.

18. Memorandum opinion, *supra* note 16, at 1313.

19. In the FSES the Agency cogently summarizes the "winter range" issue. "Overuse of wild horse wintering areas ... is an item of concern. The wintering country available to wild horses becomes limited and wild horses are forced to concentrate on certain areas where they depend upon the forage present for sustenance. Some of these sites are the first areas that cattle are allowed to use in the spring. Grazing during the spring, summer and fall by livestock eliminates forage for wild horses." FSES at 2–48 to 2–49. *See also* App. 22 (agency record containing BLM's explanation of the rationale for protecting the winter range); 1976 Opinion, finding of fact 9, 6 Envir. L.Rep. at 20803. In its current condition, as in 1976, the winter range can support a stable herd of about 340 animals without further deterioration of the range. *See supra* note 7. It therefore appears that protecting the winter range would rank as a measure necessary or appropriate to assure adequate forage for the horses only under a plan to allow the herd size to increase above 340.

20. App. 22–24.

21. The final RMP contemplates *increased* levels of cattle grazing on the winter range. App. 120–21.

cent in explaining why it did so. App. 22–24. In addition, BLM's 1981 district court testimony relating to the winter range is brief and, even as it emerges from a transcript, not particularly convincing.[22]

BLM emphasizes, however, that it did give more extensive consideration to the option of managing the Challis-area lands so as to impose "minimum constraints" on the wild horses.[23] We find BLM's "minimum constraints" alternative puzzling. At first glance, and colored by BLM's description of the option as a plan that would "[m]aximize wild horses," [24] one might conclude that this alternative insulated horses from *all* competition with cattle by securing the horses' entire range. On closer inspection, however, it appears that the option presupposes the winter range as it now exists, a range that cannot accommodate more than 340 horses because of continued cattle grazing in summer. In any event, it is plain that the "minimum constraints" plan did not track the district court's 1976

directive to focus on protecting the winter range.[25]

■ The 1976 decision is clear in its insistence upon full consideration for the option of protecting the winter range by curtailing cattle grazing.[26] BLM's efforts to fulfill that condition have been, at best, half-hearted. We therefore find unassailable the district court's rejection of BLM's claim that it has adequately complied with the directions given the Agency in the 1976 decree.

### III. THE 1978 AMENDMENTS TO THE WILD HORSE ACT

The Wild Horse Act was significantly amended in 1978. Pub.L. 95–514, 92 Stat. 1803. The district court held, however, that the 1978 legislative alterations did not affect the 1976 decision.[27] In the view of the district judge, the amended Act, just as the original 1971 measure, required detailed consideration of courses of action with an

---

**22.** App. 63–65, 78–79, 118–119, *passim.*

**23.** BLM's analysis of the "Minimum Constraints on Wild Horses" management option appears at pages 8–79 to 8–98 of the FSES.

**24.** FSES at A–4. The "Minimum Constraints on Wild Horses" plan assumed a stable herd size not in excess of 340 horses because of the limited carrying capacity of the winter range in its current condition. The plan therefore allocated forage sufficient for 340 horses on the entire horses' range. Then, remaining "noncompetitive" forage was allocated to the cattle. FSES at 8–90, A–4 to A–5.

**25.** We are troubled by an apparent absence of candid description in BLM's in-court portrayal of the "minimum constraints" plan, set out as Alternative 5 in the FSES. The plan is colored as one in which the number of horses is not limited by competition with cattle, but the 340-horse stable herd size is arrived at by focusing on the "current" winter range, the capacity of which *is* reduced by cattle grazing. We are further mystified by BLM's effort to persuade that the RMP in fact, if not in form, adopts the Alternative 5 wild horses proposals. BLM's Brief at 23, BLM's Reply Brief at 13–14. Without detailing BLM's confusing presentation, we note this significant difference: Alternative 5 planned a stable herd size of 340; the final RMP plans one of 150. Moreover, contrary to BLM's testimony in the district court and briefing here (Reply Brief at 13–14), it is evident

that the RMP contemplates an *average,* not merely an *initial,* herd size of 150. App. 34–36, 38; *see also* Challis Wild Horse Herd Management Plan (Exhibit 3) 80, 81; Challis Wild Horse Herd Management Area Plan Environmental Assessment (Exhibit 4) 8, 19. *But see* Herd Management Area Plan Environmental Assessment (Exhibit VII) at "Introduction," 7.

**26.** "Th[e] alternative of restricting livestock grazing on the winter range areas is viable and should have been considered by the [BLM]. . . . The failure to give this alternative the full and careful consideration required by the Act renders the proposed round-up plan 'arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with' the clear mandate of the Act to keep all management activities at the minimum feasible level. 5 U.S.C. § 706(2)(A)." 6 Envir.L.Rep. at 20804, conclusions of law 4 and 5.

**27.** "The [1978 amendments] . . . did not change the law upon which these [1976] conclusions of the Court are based. . . . Where the Court finds an abuse of discretion [by BLM] is in the calculation of what number [of horses] constitutes an 'excess'." Memorandum opinion, *supra* note 16, at 4–5. Our decision today necessitates a fresh finding by the district court as to the reasonableness of the Secretary's calculation of an "excess" based upon a targeted herd size of 150.

impact on the horse population less severe than removal. Such consideration, the district court believed, must occur "before any roundup or other significant management activity is undertaken."[28] In this case, the alternative still to be accorded "full and careful consideration," was restriction of cattle grazing on the winter range. Memorandum opinion, *supra* note 16, at 4. We believe the district court misinterpreted the 1978 legislative design and failed to accord the Act, as revised, the effect Congress intended it to have.

When a change in the law authorizes what had previously been forbidden it is abuse of discretion for a court to refuse to modify an injunction founded on the superseded law. *McGrath v. Potash,* 199 F.2d 166, 167–68 (D.C.Cir.1952). And in construing a change in the law a court of review does not owe to a district court's construction the substantial deference it owes to the district court's findings of fact. *See, e.g., System Federation v. Wright,* 364 U.S. 642, 648, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961). In reviewing the district court's refusal to dissolve the 1976 injunction we must, therefore, independently assess the import of the 1978 change in the governing statute.

In 1971 Congress announced the policy that "wild free-roaming horses and burros shall be protected . . . and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.[29] The 1971 Wild Horse Act provided then, as it still does today, that "[a]ll management activities shall be at the minimal feasible level." 16 U.S.C. § 1333(a). By 1978, however, Congress recognized that circumstances had changed. On the Challis range, for example, a herd that numbered 150 horses in 1971 had grown to 586 in 1978. *See* App. 29, FSES at 2–48. "In the case of wild horses and burros in the Western States, Congress acted in 1971 to curb abuses which posed a threat to their survival. The situation now appears to have reversed, and action is needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." H.R.Rep. No. 95–1122, 95th Cong., 2d Sess. 23 (1978). Congress therefore found "certain amendments are necessary [to the Wild Horse Act] to avoid excessive costs in the administration of the Act, and to facilitate the humane adoption or disposal of excess wild free-roaming horses . . . ." Pub.L. 95–514, § 2(a)(6), 92 Stat. 1803, 43 U.S.C. § 1901(a)(6) (Supp. IV 1980).

The 1978 amendments embodied two substantive goals. First, Congress struck a new balance—or at least clarified the balance Congress intended to strike in 1971—between protecting wild horses and competing interests in the resources of the public ranges. Second, Congress judged that prompt action was needed to redress the imbalance that had developed; it directed that excess horses should be removed *expeditiously.* To facilitate BLM's implementation of these twin goals, the 1978 amendments specified both the circumstances under which BLM may determine that an overpopulation of wild horses exists and the means the Agency may use to control horse populations.

The main thrust of the 1978 amendments is to cut back on the protection the Act affords wild horses, and to reemphasize other uses of the natural resources wild horses consume. The amendments introduce a definition of "excess" horses: horses are in "excess" if they "must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16

---

**28.** 6 Envir.L.Rep. at 20804, conclusion of law 2.

**29.** Nevertheless, the Joint Statement of the Committee of Conference pointed out that "the Secretaries of Interior and Agriculture are given a high degree of discretionary authority for the purposes of protection, management, and control of wild free-roaming horses and burros on the public lands." H.R.Rep. No. 92–681,

U.S.C. § 1332(f) (Supp.IV 1980).[30] This definition makes explicit what was, at most, implicit in the 1971 Act: public ranges are to be managed for multiple uses, not merely for the maximum protection of wild horses.[31] Other provisions of the 1978 legislation referring to domestic livestock grazing, multiple-use of the range, and other rangeland values,[32] 43 U.S.C. § 1901(a)(4), (6) (Supp.IV 1980), reinforce this reading.[33]

Next, the 1978 amendments made it clear that Congress expected prompt administrative action to deal with wild horse overpopulations that had developed in the period 1971–78. Congress determined that "*action is needed to prevent a successful program from exceeding its goals,*" H.R.Rep. No. 95–1122, 95th Cong., 2d Sess. 23 (1978) (emphasis added). Representative Roncalio, spon-

sor of the House proposal, referred to the need for "positive action to curb identified overpopulations." Other legislators expressed their views that wild horse overpopulations were threatening the ranges and even the survival of wild horses themselves.[34] Most importantly, the new section 1333(b)(2) specifies that excess horses "shall" be removed "immediately."

Congress gave BLM ancillary statutory tools to implement these complementary goals. First, the 1978 amendments direct the Secretary to maintain an inventory of wild horses roaming the public lands. 16 U.S.C. § 1333(b)(1) (Supp.IV 1980). This inventory, the statute explains, is intended to assist the Secretary in determining where wild horse and burro overpopulations exist.[35] Second, the 1978 amendments spec-

---

92d Cong., 1st Sess. 6–7 (1971), U.S.Code Cong. & Admin.News 1971, pp. 2149, 2160.

**30.** The 1971 Act acknowledged, indirectly, the possibility that an overpopulation might exist, 16 U.S.C. § 1333(b) (1976), but did not define "excess" horses or "overpopulation."

**31.** The 1971 Act did specify that wild horses were to be managed as "components" of the public lands, 16 U.S.C. § 1333(a), and included one reference to "multiple-use management" in the definition of a "range," 16 U.S.C. § 1332(c); the 1978 amendments invoke the "multiple use" goal directly in the definition of "excess" horses.

**32.** "Other rangeland values" include "fish, wildlife, recreation, water and soil conservation, [and] domestic livestock grazing." 43 U.S.C. § 1901(a)(6) (Supp. IV 1980). One important objective of the final RMP for the Challis range is to preserve wildlife and protect the range from further deterioration and erosion. For example, the RMP allocates about three times as much forage to big game species as to wild horses. App. 30–31.

**33.** A final indication that the 1978 Congress intended to afford less than absolute protection to wild horses is found in a change that allows the destruction of healthy wild horses by BLM as a means of population control. 16 U.S.C. § 1333(b)(2)(C) (Supp. IV 1980).

**34.** The relevant parts of the House proposal which were ultimately incorporated in the conference bill are described by Representative Roncalio at 124 Cong.Rec. 19,501 (1978). Representative Baucus remarked: "H.R. 10587 contains provisions to deal with the problems of excessive wild horses and burros on the

ranges. In many areas in the West, populations of wild horses and burros have become so large that they are actually destroying their ranges. Ranges had deteriorated to the point that wild horses are starving in many areas, and overgrazing is contributing to serious soil erosion and water pollution." *Id.* at 19,503–04. Representative Marlenee said: "H.R. 10587 is, in addition, a positive approach to the protection of wild and free-roaming horses and burros. However, due to the lack of natural predators, the BLM estimates that between 20,000 and 30,000 excess animals are currently on the public lands. Such numbers of animals have created grave problems . . . ." *Id.* at 19,507.

The original Senate proposal's response to the wild horse problem, S. 2475, 95th Cong., 2d Sess. § 7 (1978), was described by Senator Church as follows: "[I]n certain areas, populations of wild horses and burros have been so well protected that their numbers now exceed the carrying capacity of the range. This poses a threat to wildlife, livestock, overall range conditions, and even to the horses and burros themselves. . . . [E]xcess animals for which an adoption demand does not exist, are required [by the bill] to be disposed of in the most humane manner possible so as to restore a thriving natural ecologic balance to the range." 124 Cong.Rec. 1972 (1978). As reported out of committee, however, the Senate legislation did not address the overpopulation problem at all. Two senators voiced their concern with that omission, 124 Cong.Rec. 32,807–08 (1978), and ultimately the Senate conferees acceded to the House's position.

**35.** Section 1333(b)(1), reprinted *infra* note 37, makes it clear that the inventory is to serve not for the protection of wild horses, but rather to

ify what information the Secretary must possess—or, more accurately, the information the Secretary need *not* possess—before removing wild horses deemed to be in excess. 16 U.S.C. § 1333(b)(2) (Supp.IV 1980). Third, the 1978 amendments broaden the means the Secretary may employ in removing excess wild horses. The 1971 Act allowed the destruction of old or sick animals, or capture and private maintenance of healthy ones; the 1978 amendments allow, as a third and last resort, the destruction of healthy animals.[36]

The most important 1978 amendment, for our purposes, is section 1333(b)(2). That section addresses in detail the information upon which BLM may rest its determination that a horse overpopulation exists in a particular area.[37] The Agency is exhorted to consider (i) the inventory of federal public land, (ii) land use plans, (iii) information from environmental impact statements, (iv) the inventory of wild horses. But the Agency is explicitly authorized to proceed with the removal of horses "in the absence of the information contained in (i–iv)." *Id.* Clauses (i–iv) are therefore precatory; in the final analysis, the law directs that horses "shall" be removed "immediately" once the Secretary determines, *on the basis of whatever information he has at the time of his decision,* that an overpopulation exists. The statute thus clearly conveys Congress's view that BLM's findings of wild horse overpopulations should not be overturned quickly on the ground that they are predicated on insufficient information.[38]

In light of the congressional purposes and the tenor of the 1978 provisions, BLM cannot be held to the prolonged pre-removal

---

guide the Secretary in determining when horses have been overprotected. A more neutral directive to the Secretary to study wild horse population dynamics appears in section 1333(b)(3).

**36.** 16 U.S.C. § 1333(b)(2)(A)–(C) (Supp. IV 1980).

**37.** Section 1333(b) reads, in pertinent part:

(b)(1) The Secretary shall maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands. The purpose of such inventory shall be to: make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of wild free-roaming horses and burros on these areas of the public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels). In making such determinations the Secretary shall consult with the United States Fish and Wildlife Service, wildlife agencies of the State or States wherein wild free-roaming horses and burros are located, such individuals independent of Federal and State government as have been recommended by the National Academy of Sciences, and such other individuals whom he determines have scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management.

(2) Where the Secretary determines on the basis of (i) the current inventory of lands within his jurisdiction; (ii) information contained in any land use planning completed pursuant to section 1712 of title 43; (iii) information contained in court ordered environmental impact statements as defined in section 1902 of title 43; and (iv) such additional information as becomes available to him from time to time, including that information developed in the research study mandated by this section, or in the absence of the information contained in (i–iv) above on the basis of all information currently available to him, that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels. . . .

16 U.S.C. § 1333(b)(1), (2) (Supp. IV 1980).

**38.** Apparently, the district court read the 1978 revision of section 1333(b)(2) to specify only *how* animals are to be removed from the range, not *when* their numbers can be determined to be "excess." The district court therefore held that even the amended Wild Horse Act requires, pre-roundup, "careful and detailed consideration" of "*all* alternative courses of action that would have a less severe impact on the wild horse population." Memorandum opinion, *supra* note 16, at 4 (quoting from 1976 Opinion) (emphasis in the original). While the amended subsections 1333(b)(2)(A), (B), and (C) do address the manner of removal, *see supra* pp. 1317–1318, section 1333(b)(2)(i)–(iv) and the associated statutory text plainly do not.

process "full and careful consideration" of *all* alternatives would entail. A study of the winter range adequate to satisfy the 1976 decree, AHPA concedes, might take a year, during which no removal of horses would be possible, absent agreement with AHPA.[39] To insist upon such a delay pending further study at this juncture,[40] at least in light of the time-consuming study of the Challis lands, the wild horses, and alternative management strategies that BLM *has* completed, is inconsistent with the amended Act's mandate to the Secretary "immediately" to remove excess horses once an overpopulation is determined to exist. We therefore hold that BLM's failure to study the "winter range" alternative in full detail no longer supplies a basis for enjoining the removal of horses from the Challis range.[41]

**39.** The following colloquy with counsel for AHPA took place at oral argument:

Q. What would BLM have to do to satisfy you ...? They would have to consider something about restricting the winter grazing, and fencing?
A. Yes your honor. In our view they would have to give far more serious consideration than they have given to an alternative.
Q. What does that mean? ... Study it? Come up with a report?
A. Yes. We have two pages in the administrative record devoted, in a general sense, to the alternative of restricting livestock grazing on the winter range. It very superficially dismisses it for a variety of reasons discussed in my brief.
Q. Can you estimate how much time you believe it would take adequately to consider the winter range option?
A. Your honor, I do not know the BLM's planning process intimately. I do not think it would be more than a year. I think it certainly would be less than that because of the volumes of information ...
Q. And in the course of that year, absent agreement, there could be no removal?
A. That's correct.

The dissenting opinion, at nn. 24 and 25 and accompanying text, shuts from view AHPA's refusal to acquiesce in any 1981 removal and the district court's insistence on a "detailed" study "before" another roundup occurs.

**40.** The district judge stressed that he did not intend to dictate any specific course of conduct for BLM; instead, he sought only to direct what the Agency must consider before it acts. Memorandum opinion, *supra* note 16, at 1313.

## IV. CONCLUSION

Although the injunction may not be maintained on the ground that BLM has not yet carefully considered restricting cattle grazing on the winter range, the Secretary's discretion remains bounded. His orders are subject to review and may be overturned if his action is arbitrary. Today we hold only that further consideration of the "winter range" alternative, on which the district court conditioned removal of horses in its 1976 injunction, is, in light of 1978 legislation, not required. It remains open to the district court to determine on remand whether, in light of the goals of the Act as it now stands, and on the basis of the information the Secretary now has, the Agency's current plan to reduce the size of the wild horse herd well below the 340 animals the winter range can support is rationally grounded.[42]

**41.** We do not reach the question whether BLM's current roundup plan violates substantive requirements of the Wild Horse Act. *Cf. supra* note 17. Summarizing those requirements, the Secretary is obliged to manage the resources of public ranges for multiple uses, reasonably accommodating the competing interests of cattle, wild horses, other wildlife, and protecting the ranges from deterioration and erosion. *See supra* pp. 1316–1317 & n. 32.

The district court found in the Wild Horse Act's requirement of "minimal feasible level[s]" of management a command for in-depth study of all wild horse protective courses of action prior to any removal. We hold only that the 1978 amendments to the Act supersede that construction of the Act, and note again that in 1978 Congress curtailed the information BLM must possess before removing horses, introduced the "shall immediately remove" language in section 1333(b)(2), and expanded the means the Secretary may use to reduce horse populations. These alterations would have scant significance if Congress did not intend them to inform the "minimal feasible level" mandate in section 1333(a). While the 1971 Act appeared to require minimum interference with wild horses, the amended Act, though it still contains the "minimal feasible" language, emphasizes multiple use of the habitat, even at the expense of more interference with the horses.

**42.** We fully agree with our dissenting colleague that 16 U.S.C. § 1333(b)(2) does not license BLM to engage, with impunity, in an "arbitrary and capricious reasoning process." Dissenting Opinion, text accompanying note 18. We believe that BLM must rationally use all "infor-

For the reasons stated the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

SPOTTSWOOD W. ROBINSON, III, Chief Judge, dissenting in part:

I join in Parts I and II of the court's opinion, and in the court's determination in Part III that the District Court's interpretation of the Public Rangelands Improvement Act of 1978 is subject to independent review on appeal. I cannot agree, however, with my colleagues' construction of this Act removing, as a matter of law, the grounds upon which the District Court fashioned, and later refused to lift, the injunction here at issue. Because I am not persuaded that the challenged injunction is inconsistent with this Act, I would affirm the judgment of the District Court. Because today's reversing opinion rests largely on two rationales, I explicate my disagreement with each in turn.

## I. THE APPLICABILITY OF SECTION 1333(b)(2)

In 1976, the Bureau of Land Management proposed to round up and pare the herd of wild horses on the Challis public lands because it believed that their winter feeding range, as it then existed, could not adequately support them. The District Court enjoined the roundup, partly on the ground that the Bureau had not considered the "viable" alternative of increasing the winter range's supportive capability by restricting cattle grazing thereon.[1] The District Court found this failure to be arbitrary and capricious in violation of the Administrative Procedure Act,[2] and also contrary to Section 1333(a) of the Wild Free-Roaming Horses and Burros Act of 1971 (Wild Horses Act),[3] which requires the Bureau's management of wild horses to be maintained "at the minimal feasible level."[4]

In 1981, the Bureau moved to dissolve the injunction.[5] The District Court denied the motion on the ground that the Bureau still had not sufficiently considered the winter range alternative.[6] Although my col-

---

mation currently available" when it determines an overpopulation of wild horses exists. But we do not think that under the Wild Horse Act's specific guidance with respect to informational requirements the Agency acts arbitrarily or capriciously merely because it founds its decisions on the information at hand or an assessment of a reasonably limited number of alternative courses of action.

The sense of the dissenting opinion sometimes slips from the grasp. That opinion repeatedly acknowledges that under the Act as amended in 1978 BLM may not be ordered to undertake further fact-investigation or engage in further fact-finding. *See* Dissenting Opinion, text accompanying notes 10, 18. It seems unlikely that Congress would sanction limited fact-investigation and factfinding by an agency, but at the same time empower judges to insist that the agency pursue exhaustive studies of limited facts. Relevant to our different views of this case, Congress has authorized BLM to remove horses without even completing an environmental impact statement. *See supra* pp. 1318–1319. An EIS commonly addresses management options much like the "winter range alternative" that the district court has twice ordered BLM to study in detail. When Congress permitted roundups even in the absence of information from an EIS, was it not addressing the "evaluation and reasoning" stage of BLM's pre-roundup activity?

---

1. *American Horse Protection Ass'n v. Kleppe*, 6 Envtl.L.Rep. (Envtl.L.Inst.) 20802, 20804 (D.D. C.Dec.1976).

2. *Id.* at 20804.

3. *Id.*

4. 16 U.S.C. § 1333(a) (1976).

5. See Motion to Dissolve Injunction and Memorandum in Support of Motion to Dissolve Injunction, filed June 26, 1981, *American Horse Protection Ass'n v. Kleppe*, No. 76–1455 (D.D. C.).

6. See *American Horse Protection Ass'n v. Kleppe*, No. 76–1455 (D.D.C. Nov. 19, 1981) (memorandum opinion) at 4–6, reprinted in Appendix (App.) 129–131. When it fashioned the injunction in 1976, the District Court relied upon a variety of rationales, one of which was the Bureau's insufficient collection of data. See *American Horse Protection Ass'n v. Kleppe, supra* note 1, 6 Envtl.L.Rep. at 20804. In 1981, however, the District Court relied solely on the Bureau's failure to scrutinize the winter range alternative when it denied the Bureau's motion to dissolve the injunction, see *American Horse Protection Ass'n v. Kleppe, supra*, at 4–6, App. 129–131. That other theo-

leagues do not dispute this conclusion,[7] they nevertheless hold that the injunction has been superseded by Section 1333(b)(2) of the Wild Horses Act,[8] as amended by the Public Rangelands Improvement Act of 1978,[9] which provides that the Bureau may, in the absence of specified data, determine "on the basis of all information currently available" to it whether there exists an overpopulation of wild horses on public lands. I cannot agree that this statutory authorization entails that the Bureau need not give the winter range alternative suitable consideration.

I do not dispute the proposition that Section 1333(b)(2) precludes courts from formulating injunctions that would require the Bureau to engage in additional fact-investigation or factfinding on overpopulation.[10] I submit, simply, that this provision is inapplicable here. The District Court denied the Bureau's motion to dissolve the injunction, not because the Bureau lacked information, but because the Bureau had not adequately considered an identified alternative—a course of action. On the face of its 1981 opinion, the District Court in no way required the Bureau to act on any data other than that already "currently available" to it.[11] That the Bureau's superficial treatment of the winter range alternative was arbitrary represents a failure of reasoning and evaluation, not necessarily one of factfinding, and certainly not one of fact-investigation. In concluding that Section 1333(b)(2) dispenses with judicial review of the Bureau's reasoning as well as its factfinding and fact-investigation, the court resorts to an unnatural and uncommonly broad construction of the word "information." [12] A process of reasoning is not

ries initially proffered by the District Court as grounds for the injunction may be inconsistent with the Public Rangelands Improvement Act of 1978 is thus irrelevant.

7. See Maj.Op., pt. II, p. 1313.

8. See *id.*, pt. III, p. 1315.

9. Pub.L. No. 95–514 (1978), as codified at 16 U.S.C. § 1333(b)(2) (Supp. IV 1980).

10. At the outset, one might argue that the Bureau's authorization to act simply "on the basis of all information currently available" to it is inapplicable in the instant case, as it appears contingent upon the absence of data specified in clauses (i) through (iv) of § 1333(b)(2). Because information of the type listed in clause (iii), a court-ordered environmental impact statement, is available to the Bureau in this case, it might seem that the Bureau's prerogative to proceed solely on the basis of information it already has is jeopardized. I cannot, however, subscribe to such a cramped construction of the relevant statutory language. Clause (iv) of § 1333(b)(2) refers to information that becomes available to the Bureau from time to time. Because the Bureau almost always will possess information that satisfies this clause, it would eviscerate the statutory authorization, that the Bureau may ascertain on the basis of "currently available" information whether an animal overpopulation exists, to condition its efficacy upon the absence of all information specified in clauses (i) through (iv).

11. Since the District Court did not directly address the issues posed by § 1333(b)(2), one cannot be certain that it did not premise its critical finding, that the Bureau had not given sufficient consideration to the winter range alternative, on some unarticulated conclusion that the Bureau's fact-investigation or factfinding efforts were less than they should have been. If, however, the court finds this uncertainty troubling, the appropriate response would be to remand the case to the District Court for a determination whether the Bureau's assessment of the winter range alternative was deficient as measured solely by the data available to the Bureau at the time. It surely would not support the court's holding to remand for a decision whether the Bureau's action is arbitrary, yet exclude from consideration the Bureau's failure to assess adequately the winter range alternative.

12. Indeed, my colleagues appear tacitly to admit that the statutory phrase "information currently available" cannot bear the weight of their holding, for they interpret it to include as well "an assessment of a reasonably limited number of alternative courses of action," see Maj.Op. at p. 1319 n. 42, a phrase that nowhere appears in § 1333(b)(2). Furthermore, that this subsection relieves the Bureau of any court-imposed obligation to prepare an environmental impact statement, see *id.*, cannot support the expansive statutory interpretation urged by my colleagues. Because fact-investigation and factfinding activities are inextricably integral to preparation of such a statement, congressional purpose to dispense with it cannot, without more, reasonably be taken as a basis for an inflated construction of the statutory word "information," thereby curtailing judicial review of the Bureau's reasoning process,

"information" upon which the Bureau relies when it decides upon a course of action; it is the soul of the decision itself.

I am also troubled by my colleagues' failure to articulate a clear concept of the scope of judicial review under their interpretation of Section 1333(b)(2). Although they declare that the Bureau's discretion "remains bounded," [13] it is difficult to delineate the intended constraints on this discretion in light of their holding in the case at bar. By overturning the District Court's decision not to dissolve the injunction, which was based on the Bureau's refusal to deal adequately with the winter range alternative, they apparently will allow the Bureau not only to limit fact-investigation and factfinding as it chooses, but also to indulge in any manner of reasoning based on the facts at hand without judicial reproach. Such an extreme result seems inconsistent with the paucity of notice accorded this statutory provision by Congress,[14] and is indeed belied by the fact that Congress retained intact the particular statutory provision—which limits the Bureau's management activity to the "minimal feasible level"—upon which the District Court explicitly relied.[15]

Perhaps sensitive to this criticism, my colleagues hasten to emphasize that the District Court on remand may yet enjoin the proposed Bureau action if, on grounds other than the Bureau's treatment of the winter range alternative, it finds this action not "rationally grounded" on the information at hand.[16] This statement, it seems to me, is strikingly inconsistent with the general thrust of the majority opinion. To say that a decision is not "rationally grounded" on such information is simply another way of saying that the decisionmaker has used an arbitrary or otherwise defective reasoning process. Such a faulty deliberative process, I would submit, is presented by the case before us, in which the District Court enjoined contemplated Bureau action because it found the Bureau's failure to evaluate adequately a particular course of action to be arbitrary. Although the District Court did not use the precise form of words proffered by the majority opinion, it could easily have found that the Bureau's intended course of action was not "rationally grounded" upon the data it had because its deficient consideration of the winter range alternative represented an "irrational" evaluation of that data. Accordingly, I am unable to see that my colleagues' view—that proposed Bureau action not "rationally grounded" on the information at hand might be enjoined—either distinguishes the instant case or supports their apparent in-

merely on the ground that environmental impact statements may also involve subsidiary evaluations of the facts gathered.

**13.** See Maj.Op., pt. IV, p. 1319.

**14.** Section 1333(b)(2) was inserted into the Public Rangelands Improvement Act of 1978 by Conference Committee, H.R.Rep. No. 1737, 95th Cong., 2d Sess. 8, 14, U.S.Code Cong. & Admin.News 1978, p. 4069 (1978), and afterwards was not specifically addressed or acknowledged by any member of Congress, see 124 Cong.Rec. 34128–34132, 35903–35904, 35540–35542 (1978). In light of this circumstance, I would hesitate to find "persuasive reason," see *Morris v. Gressette*, 432 U.S. 491, 501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506, 516 (1977), to infer that Congress intended § 1333(b)(2) to effect serious curtailment of judicial review.

**15.** Although this provision, § 1333(a), has remained intact, its meaning has been altered by the Public Rangelands Improvement Act of 1978. The statutory words "management ac-

tivities" must now be construed to include the Bureau's responsibility to promote and balance a variety of rangeland values. This alteration, however, does not affect the case at bar. There is no evidence that the District Court enjoined the Bureau's proposed course of action because it believed that the Bureau had no right or duty to promote cattle grazing; rather, it acted on the basis of its perception that the Bureau's proposed action *unnecessarily* promoted cattle grazing at the expense of wild horses on the Challis public lands. Furthermore, even if the court feels uncertain that the District Court appreciated this change in the import of § 1333(a), the appropriate response would be to remand the case to the District Court for reconsideration in light of the change, not to preclude, as the court does today, any reconsideration of the Bureau's failure to assess adequately the winter range alternative. See note 11 *supra*.

**16.** See Maj.Op., pt. IV, p. 1319.

terpretation of the statutory word "information" to encompass the Bureau's reasoning process as well as its fact-investigation and factfinding activities.[17]

I wish to emphasize that I do not dispute a construction extending the scope of Section 1333(b)(2) to fact-investigation or factfinding activities, nor would I affirm judicial orders that required the Bureau to engage in exhaustive studies or research, or even evaluations of alternative courses of action, if compliance with such orders entailed additional fact-investigation or factfinding responsibilities on the part of the Bureau. I submit, however, that the District Court has not, as my colleagues contend, required an "exhaustive" evaluation [18] of the winter range alternative that would entail further data compilation; rather, it has mandated only that the Bureau engage in rational consideration of a specified course of action based on information at hand. In my view, it could not have done less, for I believe that Section 1333(b)(2) cannot reasonably be construed to permit the Bureau to engage in an arbitrary reasoning process with impunity. To hold otherwise not only overloads the statutory word "information," but, by precluding judicial review of such arbitrary actions, frus-

trates the congressional purpose to halt range deterioration and maximize multiple uses of public lands.

## II. The Need for Immediate Action

A subsidiary rationale advanced by my colleagues in attempted support of their broad interpretation of the statutory word "information" is that such a reading effectuates congressional intent that immediate action be taken to preserve the Challis public lands.[19] They rely particularly upon the statutory command that the Bureau, after it has ascertained both that an animal overpopulation exists and that action is necessary to remove excess animals, "shall immediately remove excess animals from the range so as to achieve appropriate management levels." [20] I cannot agree that this directive militates against the District Court's decision, based on the Bureau's disposition of the winter range alternative, not to dissolve the injunction. This provision speaks to the Bureau's responsibility only after it has determined the existence and number of excess animals; as the District Court noted,[21] it says nothing about the manner in which the Bureau shall ascertain the existence and number of excess horses. Because the case at bar involves only this

---

17. My colleagues may have intended their statement, that courts might enjoin proposed Bureau action not "rationally grounded" on information "currently available" to the Bureau, to refer only to situations in which the court finds that such action could never, on the basis of this information, be other than arbitrary or capricious. This would distinguish the case at bar, in which the District Court has held only that the reasoning process in fact used by the Bureau was arbitrary and capricious, not that the proposed Bureau action could never be the product of rational deliberation.

I do not believe, however, that this distinction, if intended by the majority opinion, is either meaningful or purposeful. First, it ignores the fact that in each instance the critical defect in the Bureau's action is an arbitrary reasoning process, which suggests that each be treated similarly. Second, this distinction does not directly address the concerns that must have prompted enactment of § 1333(b)(2), as in neither case does the court necessarily require additional fact-investigation or factfinding. Third, because the court may never be apprised or aware of all information "currently availa-

ble" to the Bureau, it will only rarely be certain that the Bureau could never adequately justify its proposed action on the basis of this information. The small number of cases that could satisfy this strict requirement for proof of "irrationality" would thus foreclose the majority opinion's apparent contention that meaningful judicial review of the Bureau's management activities under the Wild Horses Act has been preserved. Finally, there simply is nothing in the text or legislative history of § 1333(b)(2) to suggest that this arcane distinction is the key to construction of the normally specific statutory word "information." I thus would not utilize the distinction in any endeavor to interpret the scope of § 1333(b)(2).

18. See Maj.Op. at p. 1319 n. 42.

19. See Maj.Op., pt. III, p. 1315.

20. *Id.* See 16 U.S.C. § 1333(b)(2) (Supp. IV 1980).

21. See *American Horse Protection Ass'n v. Kleppe, supra* note 6, at 5, App. 130.

latter determination, the provision is inapplicable.

My colleagues also look to other statements in the legislative history that recognize the need for action, and they interpret these statements to call for *prompt* or *immediate* action.[22] The legislative history of the Public Rangelands Improvement Act of 1978, however, demonstrates that Congress did not intend what my colleagues say. The Conference Committee, which inserted the disputed language into Section 1333(b)(2), expressly warned of the dangers of hasty Bureau decisionmaking. It noted that,

> [i]n summary, the conferees agreed that excess numbers of wild horses and burros must be removed from the range, but that *caution must be exercised in determining what constitutes excess numbers.*[23]

In light of this admonition, I would not, on the basis of other, diffuse expressions of the need for action, promulgate such an expansive interpretation of Section 1333(b)(2), especially since, by placing serious constraints on judicial review, such interpretation might allow precipitous Bureau action in conflict with the overriding statutory goal of enhancing the productivity and multiple uses of rangelands.

Moreover, I cannot see that judicial scrutiny of the Bureau's reasoning process will prevent the Bureau from taking immediate effective action in the present case. The parties might, as previously they did,[24] agree extrajudicially to partial herd reductions prior to adoption and implementation of a comprehensive removal plan. And absent such negotiations or in the event they prove futile, I have no reason to doubt that the District Court would grant expeditiously a reasonable motion by the Bureau for a partial dissolution of the injunction. At any rate, full compliance with the injunction, which required only that the Bureau rationally consider an identified alternative based on information at hand, should take no more time than necessary to digest and evaluate available data. Of course, negotiations, court appearances, or compliance with the injunction will cause some delay before the Bureau can act, but this delay does not threaten to be so substantial as to warrant elimination of judicial review on these matters.[25] Indeed, my colleagues themselves apparently contemplate that proposed Bureau action might still be enjoined if it is arbitrary, and thus in effect admit that the need for prompt action must in any event recede before the need for rational decisionmaking. Accordingly, I can agree neither that a construction of the statutory word "information" excluding the Bureau's reasoning process will result in appreciable delay, nor that any delay caused by that construction justifies the severe curtailment of judicial review imposed.

---

**22.** See Maj.Op., at p. 1317 n. 34.

**23.** See H.R.Rep. No. 1737, 95th Cong., 2d Sess. 15, U.S.Code Cong. & Admin.News 1978, 4131 (1978) (emphasis added).

**24.** The Bureau and the American Horse Protection Association have twice previously, at the behest of the District Court, agreed to partial herd reductions. See Brief for Federal Appellants at 4.

**25.** My colleagues would make much of the statement by appellee's counsel that a study satisfactory to appellee might conceivably take as long as a year. See Maj.Op., at p. 1319 n. 39. I do not believe, however, that we should place much reliance on this estimate, which by counsel's own admission was made without basis in any personal knowledge of the Bureau's planning process. *Id.* at p. 1319 n. 39. Moreover, counsel stated only his belief that a time period of one year would be the outside limit for the Bureau's study, not that such study would invariably or even likely take so long. *Id.* Finally, counsel expressed only his view as to the length of time it might take the Bureau to prepare a report satisfactory to appellee; he expressed no opinion on the length of time it might take the Bureau to evaluate the winter range alternative in a manner that satisfied the requirements of the injunction. *Id.*